UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

WENDY J. WILLIAMS HUNTER, an
individual, by and through her next friend,
KELVIN HUNTER; and KELVIN HUNTER,
an individual,

                              Plaintiffs,

        v.

SABRINA E. MORRISSEY, the Guardian, in her
individual and official capacity; MORRISSEY &
MORRISSEY LLP; WELLS FARGO CLEARING
SERVICES, LLC d/b/a WELLS FARGO
ADVISORS, owned by WELLS FARGO &
COMPANY; LORI SCHILLER, in her individual
and official capacity; AMERICAN EXPRESS
COMPANY; BRESSLER, AMERY & ROSS, P.C.;
DAVID PIKUS, in his individual and official
capacity; DEBMAR-MERCURY LLC; BERNIE
YOUNG ENTERTAINMENT ENTERPRISES,
LLC; BURNETT M. YOUNG, in his individual
and official capacity; LEAH ABRAHAM;
ABRAMS FENSTERMAN, LLP; CAROLYN N.
WOLF, in her individual and official capacity;
SACKS, PRESS & LACHER P.C.; GARY PRESS,
in his individual and official capacity; WILLIAM
SELBY, in his individual and official capacity;
SHAWN ZANOTTI, in her individual and official
capacity; RAMI KAMINSKI M.D. P.C.; RAMI
KAMINSKI, in his individual and official capacity;
SOLOMON'S LAW OFFICE, P.C.; PHILLIP A.
SOLOMON, the Court Evaluator, in his individual
and official capacity; RAFFERTY & REDLISKY
LLP; LINDA REDLISKY, the Court Appointed
Attorney, in her individual and official capacity;
LAW OFFICES OF SALAMI-OYAKHILOME,

Case No. 1:25-cv-05107

**COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**

P.C.; SADATU SALAMI-OYAKHILOME, in her
individual and official capacity; ADAM SILVERA,
in his individual capacity; LISA A. SOKOLOFF, in
her individual and official capacity; OFFICE OF
THE ATTORNEY GENERAL OF NEW YORK;
ATRIA SENIOR LIVING, INC.; COTERIE
LUXURY SENIOR LIVING; AMANDA
CLEARS, in her individual and official capacity;
and JOHN/JANE DOES 1-20,

Defendants.

-------------------------------------------------------x

Plaintiff Wendy J. Williams Hunter ("Ms. Hunter"), by and through her next friend, Kelvin

Hunter ("Mr. Hunter"), and Plaintiff Mr. Hunter (collectively referred to herein as the "Plaintiffs")

by and through their attorney, Miami Entertainment Law Group, as and for their complaint against

defendants Sabrina E. Morrissey ("Sabrina Morrissey"), Morrissey & Morrissey LLP, Wells Fargo

Clearing Services, LLC d/b/a Wells Fargo Advisors, owned by Wells Fargo & Company ("Wells

Fargo"), Lori Schiller, American Express Company ("AMEX"), Bressler, Amery & Ross, P.C.,

David Pikus, Debmar-Mercury, LLC ("Debmar"), Bernie Young Entertainment Enterprises, LLC,

Burnett M. Young ("Bernie Young"), Leah Abraham, Abrams Fensterman, LLP, Carolyn N. Wolf

("Carolyn Wolf"), Sacks, Press & Lacher P.C., Gary Press, William Selby, Shawn Zanotti, Rami

Kaminski M.D. P.C., Rami Kaminski ("Dr. Rami Kaminski"), Solomon's Law Office, P.C., Phillip

A. Solomon ("Phillip Solomon"), Rafferty & Redlisky LLP, Linda Redlisky, Law Offices of

Salami-Oyakhilome, P.C., Sadatu Salami-Oyakhilome ("Sadatu Salami"), Adam Silvera ("Judge

Adam Silvera"), Lisa A. Sokoloff ("Judge Lisa Sokoloff"), Office of the Attorney General of New

York ("NYAG"), Atria Senior Living, Inc., Coterie Luxury Senior Living ("Coterie"), Amanda

Clears, and John/Jane Does 1-20 (collectively referred to herein as "Defendants")[1] hereby allege as follows:

## PRELIMINARY STATEMENT

1.    Guardianship is a civil death. A person under guardianship loses the right to make decisions and direct their own lives—typically losing the right to choose where to live, what medical care they will receive, and how they will spend their money. Accordingly, the constitutional protections afforded to an alleged incapacitated person (AIP) during the pendency of a guardianship proceeding are of crucial importance.[2] In New York, more than 28,000 adults, which includes Ms. Hunter, are being abused, neglected, and defrauded under the care of court-appointed guardians.[3] New York's current system's weak oversight, lack of transparency, and potential overbreadth is further exposed by Ms. Hunter's improper, legally deficient, and overreaching guardianship. For more than three years, Ms. Hunter has been the victim of unrestrained abuse, maltreatment, and fiscal malfeasance. Ms. Hunter's public persona and renown media career did not shield her from being unjustly subjected to an oppressive guardianship imposed under N.Y. Mental Hyg. Law § 81 (2024) ("Article 81"). For three decades, Ms. Hunter rose through the media world as a trailblazing talk show host and businesswoman. Yet, in a second,

---

[1] Plaintiffs acknowledge that judges enjoy absolute immunity for judicial acts taken within their jurisdiction. However, Judge Adam Silvera and Judge Lisa Sokoloff are not immune from this action. The ultra vires acts of Judge Adam Silvera and Judge Lisa Sokoloff described herein—including barring legal counsel without findings of incapacity, sealing proceedings without a hearing, and suspending a valid out-of-state power of attorney without jurisdiction— were non-judicial in nature or taken in the clear absence of jurisdiction. These actions were administrative, ministerial, or taken outside the scope of judicial function and thus are not protected by judicial immunity. Similarly, Court Evaluator Phillip Solomon and Court Appointed Attorney Linda Redlisky acted jointly with private actors and exceeded the scope of any quasi-judicial role. Their conduct involved knowing constitutional violations and is not entitled to immunity.

[2] Laura M. Brancato, *Navigating Right to Counsel Under Mental Hygiene Law Article 81.10*, 31 NYSBA Elder and Special Needs L.J. 23, 23-26 (2021) (discussing an AIP's right to counsel).

[3] *See* Jake Pearson, *"The Unbefriended" How New York Fails Its Most Vulnerable*, ProPublica (March 7, 2024, at 06:00 ET), https://www.propublica.org/series/the-unbefriended [https://perma.cc/Q9N4-BEYR].

she was silenced. Plaintiffs bring this lawsuit to be a voice not only for Ms. Hunter but for the more than 28,000 New Yorkers who are also being taken advantage of by a corrupt, broken system.

2.      Because a guardianship imposed upon an individual can permanently deprive them of autonomy over medical and financial decisions, Article 81 lays out a system of processes, protections, and findings that are required before a court can institute a guardianship. However, Defendants did not afford Ms. Hunter any of these procedural rights or protections. Ms. Hunter was not afforded an independent medical evaluation, timely notice of hearings, or the opportunity to meaningfully participate in the proceedings leading to the imposition of guardianship. As a result of Defendants' actions, Ms. Hunter's summarily restrictive guardianship was imposed in a secret proceeding with neither transparency or oversight nor adequate legal representation.

3.      Defendants have at all times remained deliberately indifferent to Ms. Hunter's constitutional and legal rights and have maintained conditions, policies, and practices that constitute an unlawful restraint upon Ms. Hunter's civil liberties and that are a substantial departure from accepted professional judgment, practices and standards. Despite the court-imposed restraints to her freedom of speech and the possibility of retaliation, Ms. Hunter has made several public outcries to bring awareness to Defendants' abuse, raising public concern and investigative coverage about Defendants' silencing of this competent, formerly independent woman and the unjustified nature of Ms. Hunter's guardianship.[4]

---

[4] Breakfast Club Power 105.1 FM (@BreakfastClubPower105FM), YouTube (Jan 16, 2025, at 08:00 ET), https://www.youtube.com/watch?v=bQ03Qson7AI [https://perma.cc/MXR9-BELG]; Breakfast Club Power 105.1 FM (@BreakfastClubPower105FM), YouTube (Jan 16, 2025, at 08:00 ET), https://www.youtube.com/watch?v=R-BxyXs_an8 [https://perma.cc/NA4A-K2DQ]; *Wendy Williams Lives Like a Prisoner Under Highly Restrictive Guardianship*, TMZ (Feb. 12, 2025, at 12:01 PT; updated Feb. 24, 2025, at 09:16 PT), https://www.tmz.com/2025/02/12/saving-wendy-williams-lives-like-a-prisoner-in-guardianship/ [https://perma.cc/2NT4-KMTT]; Alex Meier, *Wendy Williams calls Rosanna Scotto on live TV: Hear her speak*, FOX 5 NY (updated Mar. 11, 2025, at 11:12 ET), https://www.fox5ny.com/news/wendy-williams-calls-good-day [https://perma.cc/G8LD-B9YX]; Alexandra Bellusci, *Wendy Williams begs guardian to 'get off my neck' in explosive interview on 'The View'*, New York Post (Mar. 14, 2025, at 12:44 ET),

4.      Defendants have continuously disregarded medical advice about Ms. Hunter's mental capacities and have allowed Ms. Hunter to be subjected to overmedication and undue restrictions of her person. Despite Ms. Hunter passing a competency evaluation in or around March 2025 and being described by healthcare professionals as alert and oriented during welfare checks, neither Sabrina Morrissey, Linda Redlisky, nor Sadatu Salami have petitioned the court to revoke the guardianship based upon this finding. As such, Ms. Hunter remains a captive of a corrupt, criminal enterprise, and Plaintiffs submit this action to the Court in hopes of freeing her from this fraudulent bondage.

5.      The guardianship has become a weapon, not a shield. It serves no therapeutic purpose, no protective function. It is punishment—pure and simple.  Currently, Ms. Hunter is being confined against her will at one of Coterie's assisted living facilities with restricted access to her own phone and meaningful contact with her friends and family. Judge Lisa Sokoloff and Sabrina Morrissey isolate Ms. Hunter to preserve the enterprise's narrative, suppress the truth, and maintain financial control over her estate. Plaintiffs now turn to this Court—not just for relief, but for justice. Without this Court's intervention, the continued imposition of this guardianship over Ms. Hunter carries serious financial, physical, emotional, and psychological consequences.

6.      Defendants engaged and continue to engage in a pattern of constitutional, statutory, and fiduciary violations perpetrated under the guise of a guardianship that was wrongfully initiated and maintained in the state of New York, resulting in the unlawful deprivation of Ms. Hunter's liberty, property, and due process rights. This complaint seeks declaratory, injunctive, and compensatory relief for violations of Ms. Hunter's rights under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983; the Americans with Disabilities

---

https://nypost.com/2025/03/14/entertainment/wendy-williams-pleads-for-guardian-to-get-off-my-neck-on-the-view/ [https://perma.cc/86ZE-E4CA].

Act (ADA), 42 U.S.C. § 12101 et seq.; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962; the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 et seq.; the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681s-2 and 1681i; the Gramm-Leach-Bliley Act (GLBA), 15 U.S.C. §§ 6802–6803; and state common law. Plaintiffs respectfully seek judicial intervention to provide redress for the procedural defects of the state court judgement, to grant relief for the constitutional violations of Ms. Hunter's liberty and property rights, and to hold accountable those who conspired to and carried out this scheme under color of law.

7.      This action does not seek to overturn any state court ruling, but instead challenges independent constitutional violations committed under color of law. Plaintiffs allege extrajudicial acts—including suppression of counsel, misuse of medical and financial information, and unlawful confinement—that are not protected by judicial immunity and fall outside the Rooker-Feldman and Younger doctrines. The relief sought is prospective and compensatory for ongoing harm and is not appellate in nature.

8.      Plaintiffs recognize that Fed. R. Civ. P. 8 requires a "short and plain" statement of the claim. However, due to the extensive coordination among numerous actors—public and private—this complaint necessarily includes detailed factual allegations to show the continuity, scope, and interrelationship of each Defendant's conduct as required under 42 U.S.C. § 1983 and 18 U.S.C. § 1962. Every fact alleged is material to showing the systematic abuse of process and deprivation of federally protected rights.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 (civil rights violations), 18 U.S.C. § 1961 et seq. (RICO), 42 U.S.C. § 12101 et seq.

(ADA), 15 U.S.C. §§ 1601 et seq. (TILA), 15 U.S.C. §§ 1681s-2 and 1681i (FCRA), and 15 U.S.C. §§ 6802–6803 (GLBA).

10.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the Plaintiffs and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Ms. Hunter, although currently domiciled in New York under the constraints of a guardianship, is a natural person whose citizenship for purposes of diversity may be properly represented by her next friend or former domicile prior to the guardianship. Mr. Hunter is a citizen of the State of Florida. Upon information and belief, none of the Defendants are Florida citizens. Additionally, the financial harm, unlawful confinement, and deprivation of liberty alleged herein far exceed the $75,000 jurisdictional threshold.

11.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (4) because this action seeks redress for the deprivation of rights, privileges, and immunities secured by the Constitution and federal law committed under color of state law.

12.     This Court has supplemental jurisdiction over related state law claims, including breach of fiduciary duty, negligence, conversion, and related statutory violations, pursuant to 28 U.S.C. § 1367(a), because those claims form part of the same case or controversy under Article III of the United States Constitution.

13.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, including but not limited to: the institution and administration of

the guardianship over Ms. Hunter; financial transactions, property sales, and court proceedings involving Defendants; and Ms. Hunter's continued unlawful confinement within this jurisdiction.

15.     Defendants reside in, are employed within, conduct business in, or committed wrongful acts in the Southern District of New York, and therefore are subject to personal jurisdiction in this forum.

16.     This case does not warrant abstention under *Younger v. Harris*, 401 U.S. 37 (1971), or related doctrines. The constitutional violations challenged here—coercion, denial of counsel, suppression of speech, and financial exploitation—are not the subject of ongoing parallel proceedings that provide an adequate opportunity for relief. The guardianship proceedings are closed or non-adjudicative in nature and lack procedural safeguards. Furthermore, Plaintiffs allege bad faith and extraordinary circumstances, including violations of due process and First Amendment rights, that preclude abstention. Abstention is also inappropriate where, as here, declaratory and injunctive relief are sought to halt continuing harm.

## PARTIES

*Plaintiffs*

17.     Ms. Hunter is an internationally recognized media figure, former radio personality, renown talk show host, and entrepreneur. Ms. Hunter is a U.S. citizen, currently residing in New York, who was denied due process and wrongfully subjected to a state court guardianship under N.Y. Mental Hyg. Law § 81 (2024). Ms. Hunter is still subject to a plenary guardianship imposed by the Supreme Court of the State of New York, which is challenged in this action as unconstitutional and unlawful.

18.     Mr. Hunter is Ms. Hunter's former husband and the father of Ms. Hunter's only child, Kevin Hunter, who has suffered direct and personal injury because of the imposition and administration of Ms. Hunter's guardianship. Familiar with Ms. Hunter's history and financial

practices, Mr. Hunter has a genuine concern for Ms. Hunter's welfare and brings this claim to advocate for their family as an interested party under federal common law and New York guardianship doctrine. Due to her guardianship, Ms. Hunter is unable to litigate her own interests. Moreover, because Ms. Hunter's friends and family have a credible fear of retaliation from the court—including, but not limited to, retaliation from Judge Lisa Sokoloff and Sabrina Morrissey— if they were to take legal action on Ms. Hunter's behalf, Mr. Hunter brings this action because no one else is able, or has been willing, to do so. Because Ms. Hunter's court-appointed guardian, Sabrina Morrissey, has acted in a manner contrary to Ms. Hunter's interests—through neglect, obstruction, and active malfeasance—Mr. Hunter has sought judicial intervention pursuant to Fed. R. Civ. P. 17(c) and NY CPLR § 1201 (2024) to contest Sabrina Morrissey's appointment. Mr. Hunter's appointment as Ms. Hunter's next friend is proper to vindicate Ms. Hunter's constitutional rights. Mr. Hunter has had a significant relationship with Ms. Hunter, is not pursuing appointment as Ms. Hunter's guardian to take control over her person, assets or legal decisions, and is capable of fairly and adequately prosecuting this action on her behalf. Mr. Hunter's individual claims arise from the financial and emotional harm he has suffered which can be directly traced to Defendants' fraudulent initiation and unlawful administration of the guardianship proceeding. Mr. Hunter has suffered harm as a direct result of Lori Schiller, Wells Fargo, and Sabrina Morrisey's willful refusal to honor Ms. Hunter's court approved financial obligations. Mr. Hunter is a U.S. citizen residing in Florida who also challenges the guardianship as unlawful due to the consequences of its imposition upon his son, which include loss of housing, interruption of education, alienation of affection, emotional distress due to displacement and lack of access to essential resources previously maintained by Ms. Hunter and the infliction of significant emotional harm and instability. The injuries to Mr. Hunter—including financial disruption and emotional

distress—are concrete, particularized, and directly traceable to Defendants' conduct. Mr. Hunter also asserts associational standing based on targeted familial interference.

*Defendants*

19.     Sabrina Morrissey was appointed by Judge Lisa Sokoloff to act as Ms. Hunter's guardian and, upon information and belief, continues to serve in such capacity. Upon information and belief, Sabrina Morrissey is a U.S. citizen residing in New York and is being sued in her individual and official capacity. Sabrina Morrissey was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

20.     Morrissey & Morrissey LLP is a New York boutique law firm with offices located at 369 Lexington Avenue, Suite 209, New York, NY 10017. Morrissey & Morrissey LLP is responsible for the actions of its agent, Sabrina Morrissey. Therefore, Morrissey & Morrissey LLP was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

21.     Wells Fargo is a federally regulated financial institution that transacts business in this District, with offices located at 375 Park Avenue, 7th Floor, New York, NY 10152. Wells Fargo is Ms. Hunter's financial institution and creditor. Wells Fargo initiated the Article 81 proceedings against Ms. Hunter, petitioning for Ms. Hunter's guardianship in the New York Supreme Court, County of New York and is being sued for its direct role in initiating the unlawful guardianship and misuse of Ms. Hunter's funds. Wells Fargo is also responsible for the actions of its agent, Lori Schiller, and therefore Wells Fargo was and is at all relevant times directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

22.     Lori Schiller is a Wells Fargo employee and served as Ms. Hunter's financial advisor for more than ten years. Among Lori Schiller's responsibilities as Ms. Hunter's financial advisor was to manage and pay Ms. Hunter's bills, which Lori Schiller often completed using wire

transfers from Ms. Hunter's bank accounts or charges to Ms. Hunter's AMEX card. Lori Schiller facilitated the transfer and misuse of Ms. Hunter's assets for personal gain and in furtherance of the criminal enterprise averred herein. Upon information and belief, Lori Schiller is a U.S. citizen residing in New York and is being sued in her individual and official capacity. Lori Schiller was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

23.      AMEX is a financial institution that transacts business in this District, with a principal office located at 200 Vesey Street, New York, NY 10285. AMEX acted as Ms. Hunter's creditor and issuer of business credit card services. AMEX is being sued for its role in restricting Ms. Hunter's access to her lines of credit at the direction of Lori Schiller and for its complicity in a broader racketeering enterprise targeting Ms. Hunter. AMEX was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

24.      Bressler, Amery & Ross, P.C. is a national, full-service law firm with offices located at 17 State Street, 34th Floor, New York, NY 10004. Bressler, Amery & Ross, P.C. provided legal services to Wells Fargo for the guardianship proceeding against Ms. Hunter. Bressler, Amery & Ross, P.C. is also responsible for the actions of its agent, David Pikus. Therefore, Bressler, Amery & Ross, P.C. was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

25.      David Pikus is an attorney at Bressler, Amery & Ross, P.C., and acted as legal counsel for Wells Fargo in the guardianship proceeding brought against Ms. Hunter. Upon information and belief, David Pikus is a U.S. citizen residing in New York and is being sued in his individual and official capacity. David Pikus was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

26.     Debmar is a New York production, syndication, and distribution company with offices located at 530 5th Avenue, 26th Floor, New York, NY 10036. Debmar is a wholly owned subsidiary of Lionsgate Studios and Ms. Hunter's former television production partner for The Wendy Williams Show. Debmar is being sued under theories of vicarious liability for the actions of its agents, Bernie Young and Bernie Young Entertainment Enterprises, LLC. Therefore, Debmar was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

27.     Bernie Young Entertainment Enterprises, LLC is a New York business entity used by Bernie Young to provide entertainment management services and with offices located at 45 West 60th Street, #10D, New York, NY 10023. Bernie Young used Bernie Young Entertainment Enterprises, LLC to manage or attempt to control Ms. Hunter's professional affairs and is being sued for its role in financial misconduct because of the actions of its agents, Bernie Young and Leah Abraham. Therefore, Bernie Young Entertainment Enterprises, LLC was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

28.     Bernie Young is a former television manager and associate of Ms. Hunter. Bernie Young, through his company Bernie Young Entertainment Enterprises, LLC, was contracted and hired by Debmar to monitor and pseudo-manage Ms. Hunter's employment as a talk show host for The Wendy Williams Show and to serve as Ms. Hunter's handler. Prior to August 2021, Bernie Young's management of Ms. Hunter was terminated. Upon information and belief, Bernie Young did not have a management contract directly with Ms. Hunter. Bernie Young defrauded Ms. Hunter for personal gain and in furtherance of the criminal enterprise averred herein. Upon information and belief, Bernie Young is a U.S. citizen residing in New York who is being sued in his individual and official capacity for his unauthorized financial dealings and involvement in the guardianship

proceeding. Bernie Young is also vicariously liable for the actions of his agent, Leah Abraham.
Bernie Young was and is at all relevant times personally and directly involved in decisions to
establish and maintain the guardianship over Ms. Hunter.

29.    Upon information and belief, Leah Abraham is an associate or employee of Bernie
Young Entertainment Enterprises, LLC and Bernie Young. Leah Abraham was provided with and
used an AMEX card attached to Ms. Hunter's AMEX account to make unauthorized charges. Upon
information and belief, Leah Abraham is a U.S. citizen residing in New York and is being sued in
her individual capacity.

30.    Abrams Fensterman, LLP is a New York full-service law firm with offices located
at 1 MetroTech Center, Suite 1701, Brooklyn, NY 11201. Abrams Fensterman, LLP represented
Bernie Young in filing a guardianship petition against Ms. Hunter and is being sued for its
participation in the unlawful guardianship process. Abrams Fensterman, LLP is also responsible
for the actions of its agent, Carolyn Wolf. Therefore, Abrams Fensterman, LLP was and is at all
relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

31.    Carolyn Wolf is an attorney at Abrams Fensterman, LLP, and acted as legal counsel
for Bernie Young in the guardianship proceeding brought against Ms. Hunter. Upon information
and belief, Carolyn Wolf is a U.S. citizen residing in New York and is being sued in her individual
and official capacity. Carolyn Wolf was and is at all relevant times personally and directly involved
in decisions to establish and maintain the guardianship over Ms. Hunter.

32.    Sacks, Press & Lacher, P.C. is a New York accounting firm with offices located at
600 Third Avenue, Suite 2604, New York, NY 10016. Sacks, Press & Lacher, P.C. is involved in
the management of Ms. Hunter's finances and is being sued for its role in facilitating financial
misconduct. Sacks, Press & Lacher, P.C. is also responsible for the actions of its agent, Gary

Press. Therefore, Sacks, Press & Lacher, P.C. was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

33. Gary Press served as Ms. Hunter's certified public accountant (CPA) since at least 2013, and upon information and belief, Gary Press continued to serve as Ms. Hunter's CPA after the institution of the guardianship. Gary Press' failure to timely file and prepare Ms. Hunter's taxes is the direct result of Ms. Hunter incurring substantial tax liabilities and excessive legal fees. Upon information and belief, Gary Press is a U.S. citizen residing in New York who is being sued in his individual and official capacity for his failure to properly manage and protect Ms. Hunter's financial obligations. Gary Press was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

34. William Selby is a jeweler and a purported manager of Ms. Hunter. William Selby is being sued for financial exploitation and unauthorized use of Ms. Hunter's name and story and for aiding in and profiting from Ms. Hunter's unlawful confinement. Upon information and belief, William Selby is a U.S. citizen residing in New Jersey and William Selby rendered management services to Ms. Hunter within the State of New York. William Selby was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

35. Shawn Zanotti is a publicist and participated in the production of a Lifetime documentary regarding Ms. Hunter's guardianship. Upon information and belief, Shawn Zanotti is a U.S. citizen residing in California and is being sued for the exploitation of Ms. Hunter's person, the use of Ms. Hunter's name and story and for aiding in and profiting from Ms. Hunter's unlawful confinement. Shawn Zanotti was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

36.     Rami Kaminski M.D. P.C. is a professional corporation organized and existing under the laws of the State of New York with offices located at 27-37 Palisade Avenue, Riverdale, NY 1046. Upon information and belief, Rami Kaminski M.D. P.C. is the medical practice through which Dr. Rami Kaminski conducts his clinical and consultative services. At all relevant times, Dr. Kaminski acted within the scope of his employment or affiliation with this entity when he unlawfully disclosed confidential medical information concerning Ms. Hunter and authored a conclusory letter used to initiate a guardianship proceeding without consent, examination, or proper medical basis. Rami Kaminski M.D. P.C. is also responsible for the actions of its agent, Dr. Rami Kaminski. Therefore, Rami Kaminski M.D. P.C. was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

37.     Dr. Rami Kaminski is a New York psychiatrist with offices located at 940 Park Avenue, New York, NY 10028. Dr. Rami Kaminski authored the Kaminski Letter without providing a basis for his medical opinion and disclosed Ms. Hunter's protected health information to Wells Fargo and Lori Schiller, without Ms. Hunter's knowledge or consent or a court order. The Kaminski Letter, which was unsupported by facts, provided insufficient reasoning, lacked sufficient detail and was acquired through unlawful means, served as the primary basis for which Wells Fargo initiated the guardianship proceeding against Ms. Hunter. Upon information and belief, Dr. Rami Kaminski is a U.S. citizen residing in New York and is being sued in his individual and official capacity for participating in the submission of false evidence to a court under color of law. Dr. Rami Kaminski was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

38.     Solomon's Law Office, P.C. is a New York law firm with offices located at 449 Greene Avenue, Brooklyn, New York 11216 and is the law firm of Phillip Solomon. Solomon's

Law Office, P.C. is responsible for the actions of its agent, Phillip Solomon. Therefore, Solomon's Law Office, P.C. was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

39.     Phillip Solomon was appointed by Judge Lisa Sokoloff to serve as the Court Evaluator for Ms. Hunter's guardianship proceeding, and Phillip Solomon materially participated in recommending the imposition and/or continuation of the guardianship. Upon information and belief, Phillip Solomon is a U.S. citizen residing in New York and is being sued in his individual and official capacity for failing to conduct a meaningful investigation and for facilitating the imposition of the guardianship. Phillip Solomon was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

40.     Rafferty & Redlisky LLP is a New York law firm with offices located at 629 Fifth Avenue, #302, Pelham, NY 10803 and is the law firm of court-appointed counsel Linda Redlisky. Rafferty & Redlisky LLP is responsible for the actions of its agent, Linda Redlisky. Therefore, Rafferty & Redlisky LLP was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

41.     Linda Redlisky was appointed by Judge Lisa Sokoloff to serve as the Court Appointed Attorney to represent Ms. Hunter in the guardianship proceeding. Upon information and belief, Linda Redlisky is a U.S. citizen residing in New York and is being sued in her individual and official capacity for failing to advocate for Ms. Hunter and for participating in the deprivation of Ms. Hunter's rights by acting jointly with other Defendants. Linda Redlisky was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

42.     The Law Offices of Salami-Oyakhilome, P.C. is a New York law firm with offices located at 147-26 Hillside Avenue, 2nd Floor, Jamaica, NY 11435 and is the law firm of Sadatu Salami. The Law Offices of Salami-Oyakhilome, P.C. is responsible for the actions of its agent, Sadatu Salami. Therefore, the Law Offices of Salami-Oyakhilome, P.C. was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter

43.     Sadatu Salami is an attorney who was brought into the guardianship matter by Ms. Hunter's retained counsel, Miami Entertainment Law Group, to assist in Ms. Hunter's representation after Judge Lisa Sokoloff barred Ms. Hunter's retained counsel from being involved in the proceeding. Upon information and belief, Sadatu Salami is a U.S. citizen residing in New York and is being sued in her individual and official capacity for failing to act in Ms. Hunter's best interests, acting jointly with other Defendants to deprive Ms. Hunter of rights, and participating in prolonging the guardianship. Sadatu Salami was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

44.     Judge Adam Silvera is the Deputy Chief Administrative Judge for the New York City Courts and Judge Adam Silvera acted as an Administrative Judge of the New York County Supreme Court's Civil Term in or around February 2022. Upon information and belief, Judge Adam Silvera is a U.S. citizen residing in New York and is being sued in his individual capacity for actions taken outside the scope of judicial immunity. At all relevant times, Judge Adam Silvera acted under color of state law by granting a request made by David Pikus to seal the entire record in Ms. Hunter's emergency petition without notice to Ms. Hunter or her retained counsel and without holding a hearing or providing Ms. Hunter with an opportunity to be heard.

45.     Judge Lisa Sokoloff is a Justice of the New York County Supreme Court's Civil Term who approved or facilitated the unlawful guardianship of Ms. Hunter without adequate

procedural safeguards. Upon information and belief, Judge Lisa Sokoloff is a U.S. citizen residing in New York and is being sued in her individual and official capacity to the extent she acted outside her jurisdiction, violated constitutional mandates, and acted outside of the scope of judicial immunity. Judge Lisa Sokoloff was and is at all relevant times personally and directly involved in decisions to establish and maintain the guardianship over Ms. Hunter.

46. NYAG is responsible for enforcing the rights of individuals adjudicated to be incapacitated under court-appointed guardianships and overseeing public interest matters involving abuse and exploitation. NYAG is being sued for its inaction and failure to intervene despite public reports of harm.

47. Atria Senior Living, Inc. is a Delaware corporate operator of assisted living facilities with offices located at 300 East Market Street, Suite 100, Louisville, KY 40202. Atria Senior Living, Inc. has assisted living facilities throughout New York, one of which is Coterie. Sabrina Morrissey engaged Atria Senior Living, Inc's care services on Ms. Hunter's behalf. Atria Senior Living, Inc. is being sued for aiding in and profiting from Ms. Hunter's confinement without lawful authority. Atria Senior Living, Inc. was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

48. Coterie, an affiliate of Atria Senior Living, Inc., is an assisted living facility located at 505 W. 35th Street, New York, NY 10001, which is the last known location of Ms. Hunter's unlawful confinement. Sabrina Morrissey engaged Coterie's care services on Ms. Hunter's behalf. Coterie is being sued for restricting Ms. Hunter's liberty, monitoring her communications, violating her right to privacy, exploiting her current circumstances for financial gain, and acting in concert with Sabrina Morrissey to isolate Ms. Hunter from friends, family, and counsel. Coterie is also responsible for the actions of its agents, including Amanda Clears. Coterie Luxury Senior

Living was and is at all relevant times involved in decisions to establish and maintain the guardianship over Ms. Hunter.

49.     Amanda Clears was employed as Ms. Hunter's care specialist at Coterie and was entrusted with direct responsibility for the care, supervision, and wellbeing of Ms. Hunter. Upon information and belief, Amanda Clears is a U.S. citizen residing in New York and is being sued in her individual and official capacity for violating her legal, fiduciary, and ethical duties as a care specialist. Her conduct, as alleged herein, includes the unlawful disclosure of confidential health and location information, unauthorized photographing of Ms. Hunter in various stages of undress, and participation in a broader scheme of exploitation, all of which directly harmed Ms. Hunter's safety, privacy, and emotional wellbeing.

50.     Upon information and belief, each of the Defendants, including Defendants DOES 1 through 20, performed, participated in, aided and/or abetted, or was deliberately indifferent to the acts averred herein, and thereby proximately caused the injuries averred below. The true names and official capacities of Defendants designated as DOES 1 through 20, inclusive, are unknown to Plaintiffs, who therefore sue these Defendants by fictitious names. Plaintiffs will seek leave of Court to amend their complaint to show the true names and capacities of these Defendants when they have been ascertained.

51.     Upon information and belief, and at all relevant times, each and every Defendant was the agent of each and every other Defendant, was acting within the course and scope of such agency, and was acting with the consent, permission, and authorization of each of the remaining Defendants.

52.     Upon information and belief, all actions of each Defendant were ratified and approved by every other Defendant.

53.     Plaintiffs bring this action to redress a pattern of coordinated, independent constitutional violations involving public and private actors who, under color of law, unlawfully seized control over Ms. Hunter's person and property.[5] The complexity and number of defendants reflect the breadth of the conspiracy, not an attempt to obscure claims. Each fact is pleaded with specificity and relevance to demonstrate the systemic nature of the unlawful guardianship and the ongoing civil rights violations.

## STANDING

54.     During their marriage, Mr. Hunter served as Ms. Hunter's trusted business manager and advisor, playing a central role in managing Ms. Hunter's professional, financial, and personal affairs. Under his stewardship, Ms. Hunter's career flourished, her brand expanded, and her finances remained stable and secure.

55.     Following their divorce, Ms. Hunter was left to navigate complex financial and medical matters without Mr. Hunter's experienced oversight. It was during this period that individuals such as Lori Schiller and Bernie Young began to exploit Ms. Hunter's trust and financial resources. Lori Schiller and Bernie Young placed themselves into positions of undue influence—managing Ms. Hunter's accounts, controlling communications, and orchestrating a campaign to remove her autonomy under the guise of concern.

56.     Despite their divorce, Mr. Hunter has remained involved in Ms. Hunter's life and possesses personal and familial knowledge relevant to Ms. Hunter's capacity, care, and treatment, particularly during the period of concern giving rise to this Complaint. As such, Mr. Hunter is well-

---

[5] The Supreme Court has held that the Rooker-Feldman doctrine does not bar claims that challenge independent constitutional violations rather than seeking to overturn a state court judgment (*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005)). Plaintiffs do not seek to appeal or vacate the underlying guardianship ruling but rather asserts that Defendants' conduct violated federal constitutional rights separate from the state court's jurisdiction. As such, Rooker-Feldman is inapplicable.

positioned to serve as next friend to Ms. Hunter under federal law, where a party may act on behalf of an individual unable to assert their own rights and when no guardian is acting in their best interests. *See Whitmore v. Arkansas*, 495 U.S. 149, 163-64 (1990).

57.    Mr. Hunter also brings this action in his own right as an interested party because he is a named beneficiary to obligations owed under a valid Martial Settlement Agreement.

## FACTS ALLEGED IN SUPPORT OF ALL CAUSES OF ACTION

*Initiation of the Wells Fargo Guardianship Proceeding*

58.    Wells Fargo, acting through Lori Schiller, froze Ms. Hunter's bank accounts on or about January 18, 2022, without prior notice to Ms. Hunter. This abrupt and unexplained action denied Ms. Hunter access to her secured credit accounts, assets, bank records, and personal finances, disrupted Ms. Hunter's obligations under legally binding settlement agreements, and triggered legal exposure due to missed payments.

59.    Two days later and without Ms. Hunter's knowledge or consent, Dr. Rami Kaminski authored a two-sentence medical opinion letter dated January 20, 2022 (the "Kaminski Letter"), falsely asserting that Ms. Hunter had impaired judgment and was incapable of making reasoned decisions. Dr. Rami Kaminski sent the Kaminski Letter to Lori Schiller and Wells Fargo. True and correct copies of Ms. Hunter's complaint against Dr. Rami Kaminski to the U.S. Department of Health and Human Services, Office for Civil Rights (OCR) and New York State Department of Health Office of Professional Medical Conduct (OPMC), which have been redacted in accordance with Fed. R. Civ. P. 5.2 and SDNY ECF Rules & Instructions § 6, are attached hereto as **Exhibit A**.

60.    The Kaminski Letter did not provide the basis for the medical opinion (e.g., results of medical testing or a comprehensive evaluation of Ms. Hunter), reference consultations with Ms.

Hunter's treating physicians, or cite relevant medical records or studies to provide a more complete understanding of Ms. Hunter's condition. A copy of the Kaminski Letter is attached hereto as **Exhibit B**.

61.    Prior to Dr. Rami Kaminski authoring the Kaminski Letter, Lori Schiller authorized six payments of $10,000 from Ms. Hunter's AMEX card—totaling $60,000—to Dr. Rami Kaminski between November 7, 2021 and January 14, 2022 without Ms. Hunter's consent.

62.    The sum paid to Dr. Rami Kaminski represented a gross disparity in Ms. Hunter's routine medical expenses with licensed specialists, which averaged approximately $200 per visit. This discrepancy raises serious concerns regarding the purpose and justification of the payments. True and correct copies of Ms. Hunter's AMEX statements, which have been redacted in accordance with Fed. R. Civ. P. 5.2 and SDNY ECF Rules & Instructions § 6, are attached hereto as **Exhibit C**.

63.    Upon information and belief, Lori Schiller, leveraging her position at Wells Fargo, made self-serving statements alleging that Ms. Hunter had instructed Lori Schiller to do whatever it takes and go scorched earth if Lori Schiller perceived that Ms. Hunter was being exploited. These fabricated instructions, which were known only to Lori Schiller, formed the cornerstone of the justification for Wells Fargo's filing of its guardianship petition, helping to conceal the true basis for intervening in Ms. Hunter's affairs. Further, Wells Fargo and Lori Schiller conspired with Dr. Rami Kaminski to utilize the Kaminski Letter as the primary basis to initiate a guardianship proceeding under Article 81 of the New York Mental Hygiene Law against Ms. Hunter.

64.    Even though Ms. Hunter was regularly seeing other healthcare specialists—none of whom raised concerns about her mental capacity—no consultations or evaluations from these

providers were obtained. These providers were also not consulted regarding Ms. Hunter's mental capacity or physical fitness prior to Wells Fargo initiating the guardianship proceeding.

65.    Because Wells Fargo froze Ms. Hunter's bank accounts, Ms. Hunter was forced to sustain her livelihood exclusively through the utilization of AMEX cards. With full knowledge of this precarious situation, Lori Schiller suspended Ms. Hunter's AMEX privileges without cause and without Ms. Hunter's knowledge or consent.

66.    AMEX, acting at the direction of Wells Fargo and Lori Schiller, unlawfully restricted Ms. Hunter's access to her own credit accounts—effectively disabling Ms. Hunter from managing personal and business affairs.

67.    Further, as a direct and unavoidable consequence of Lori Schiller's wrongful and tortious conduct and not because of any animosity or dispute between Plaintiffs, Mr. Hunter was compelled to initiate a post-disposition relief motion in the Superior Court of New Jersey, Chancery Division, Family Part, under Docket No. FM-09-001472-25-R. This legal action was necessitated by the Defendants' interference with financial obligations arising from Ms. Hunter's divorce, forcing Mr. Hunter to seek judicial intervention for relief.

68.    On or about February 4, 2022, after failed attempts to access her accounts and speak with AMEX representatives to resolve the matter and after not receiving any communication from Wells Fargo or Lori Schiller regarding the basis for same, Ms. Hunter filed for emergency injunctive relief in New York County Supreme Court to enjoin Wells Fargo from interfering with her right to access her financial assets and statements. True and correct copies of Ms. Hunter's Emergency Petition filed on or about February 4, 2022 and Ms. Hunter's supporting affirmation filed on or about February 9, 2022 are attached hereto as **Exhibit D**; a true and correct copy of the

February 1, 2022 through 2, 2022 email exchange between Ms. Hunter's retained counsel and Wells Fargo employees Dennis Schmidt and Beverly Jo Slaughter is attached hereto as **Exhibit E**.

69.    On or about February 9, 2022, Judge Arlene Bluth signed Ms. Hunter's Emergency Petition and issued an order to show cause, directing Wells Fargo to explain by February 15, 2022, why a temporary restraining order and preliminary injunction should not be granted. This action by Judge Arlene Bluth signaled judicial recognition of the urgency and legal sufficiency of Ms. Hunter's claims.

70.    However, Wells Fargo failed to comply with the court's directive and never responded to Ms. Hunter's Emergency Petition. Instead, Wells Fargo filed an ex parte Article 81 guardianship petition on or about February 9, 2022, relying almost exclusively on the Kaminski Letter (the "Wells Fargo Guardianship Petition"). Wells Fargo failed to personally serve Ms. Hunter or her counsel of record, and Ms. Hunter was not given an opportunity to respond prior to judicial action.

71.    In a letter to Judge Arlene Bluth dated February 9, 2022, David Pikus, on Wells Fargo's behalf, without a motion or proper application supported by specific legal grounds, requested that the case be sealed from the public. Judge Adam Silvera approved such request on or about February 14, 2022—the day before Wells Fargo was to respond to Ms. Hunter's Emergency Petition per Judge Arlene Bluth's order—without allowing for Ms. Hunter to have a hearing on the matter and without giving Ms. Hunter's retained counsel an opportunity to object. A true and correct copy of Ms. Hunter's retained counsel's letter to Judge Arlene Bluth dated February 9, 2022, requesting emergency ex parte restraints, inclusive of Judge Arlene Bluth's February 9, 2022 order and David Pikus' letter to Judge Arlene Bluth dated February 9, 2022, is attached hereto as **Exhibit F**.

72.    On or about February 14, 2022, Ms. Hunter's Emergency Petition was also reassigned to Judge Lisa Sokoloff—at which point the legal irregularities and abuses central to this Complaint began to unfold. It should be noted that the court proceedings pertaining to Ms. Hunter's Emergency Petition are still active. A true and correct copy of the case details for Ms. Hunter's Emergency Petition (i.e., 650570/2022 – New York County Supreme Court) is attached hereto as **Exhibit G**.

73.    Upon information and belief, serious questions arise concerning the impartiality and propriety of the assignment of Ms. Hunter's guardianship proceeding to Judge Lisa Sokoloff. The manner in which this sensitive matter was designated to Judge Sokoloff prompts inquiry into whether the assignment was the result of a fair and impartial random selection process, or conversely, if it constituted a targeted designation designed to achieve a predetermined outcome adverse to Ms. Hunter's interests and rights.

74.    On the exact day that the parties were notified via NYSCEF that Judge Lisa Sokoloff was assigned to preside over Ms. Hunter's emergency petition, a hearing was held for the guardianship proceeding, which Judge Lisa Sokoloff also presided over. A true and correct copy of Judge Adam Silvera's transfer order dated February 14, 2022 and filed February 16, 2022 sealing Ms. Hunter's Emergency Petition against Wells Fargo is attached hereto as **Exhibit H**; true and correct copies of NYSCEF alerts regarding the reassignment of Ms. Hunter's Emergency Petition and its sealing are attached hereto as **Exhibit I**.

75.    Following the initiation of the guardianship proceeding, Dr. Joseph Girgis of Superior Medical Centers in Weston, Florida wrote a medical opinion letter dated February 18, 2022 after conducting a comprehensive neurologic examination and testing on Ms. Hunter, which directly contradicted the alleged findings stated in the Kaminski Letter. A true and correct copy of

Dr. Joseph Girgis' medical evaluation of Ms. Hunter, which has been redacted in accordance with Fed. R. Civ. P. 5.2 and SDNY ECF Rules & Instructions § 6, is attached hereto as **Exhibit J**.

*Suppression of Counsel*

76.    During the February 16, 2022 hearing, Judge Lisa Sokoloff effectively barred Ms. Hunter's retained counsel, Miami Entertainment Law Group, from filing papers or appearing on Ms. Hunter's behalf in the guardianship proceeding, denying her the fundamental right to counsel of choice.

77.    Additionally, without confirming whether Bernie Young was lawfully retained and authorized to speak to Ms. Hunter's finances or even qualified to manage her financial matters, Judge Lisa Sokoloff, Wells Fargo, Lori Schiller, and David Pikus relied on Bernie Young to verify or validate financial payments/obligations on Ms. Hunter's behalf.

78.    Ms. Hunter's retained counsel made every effort to advocate on Ms. Hunter's behalf, but their efforts were thwarted by Judge Lisa Sokoloff, David Pikus, Linda Redlisky, Phillip Solomon, Sabrina Morrissey, and Carolyn Wolf (i.e., the counsel for cross-petitioner Bernie Young).

79.    Despite Ms. Hunter's retained counsel filing a notice of appearance in the guardianship proceeding on or about March 17, 2022, Judge Lisa Sokoloff instructed the parties not to share any filed documents with Ms. Hunter's retained counsel. Because of this, Ms. Hunter's retained counsel was left in the dark with the inability to advocate for Ms. Hunter's best interests. True and correct copies of the email exchanges between Judge Lisa Sokoloff and the parties from March 18, 2022 through March 28, 2022 are attached hereto as **Exhibit K**.

80.    Judge Lisa Sokoloff gave these instructions to the parties prior to making a determination as to whether Ms. Hunter's retained counsel was chosen freely and independently.

Alleging that Ms. Hunter's chosen counsel was unable to represent Ms. Hunter's interests in the guardianship proceeding, Judge Lisa Sokoloff appointed counsel of her choosing, Linda Redlisky, who would become yet another figure complicit in this ongoing abuse. Despite Judge Lisa Sokoloff stating that a further conference would be scheduled if Ms. Hunter's retained counsel had an issue with Linda Redlisky's appointment, Judge Lisa Sokoloff administratively silenced Ms. Hunter's retained counsel from voicing their concerns.

81.    Tellingly, Wells Fargo and Linda Redlisky are financial contributors to Judge Lisa Sokoloff's re-election campaigns. Upon information and belief, each made contributions to Judge Lisa Sokoloff's campaign efforts at the time that the Article 81 proceedings against Ms. Hunter took place.

82.    Linda Redlisky failed to challenge the court's jurisdictional overreach and lack of jurisdiction, did not demand an independent evaluation, and did not seek to reinstate Ms. Hunter's chosen counsel or her advance directives.

83.    Sadatu Salami, one of the attorneys brought in by Ms. Hunter's retained counsel to assist in Ms. Hunter's representation, failed to advocate for Ms. Hunter and instead acted in concert with other Defendants to perpetuate the guardianship for financial gain. Sadatu Salami failed to challenge the court's jurisdictional overreach and lack of jurisdiction, did not demand an independent evaluation, and did not seek to reinstate Ms. Hunter's chosen counsel or her advance directives.

84.    A comprehensive medical evaluation conducted in or around March 2025 determined that Ms. Hunter was alert and competent. However, neither Sabrina Morrissey, Linda Redlisky, nor Sadatu Salami have filed a petition to terminate or modify the guardianship.

*Financial Exploitation and Fiduciary Breach*

85.    Unbeknownst to Ms. Hunter, she ultimately funded her own imprisonment as a result of Defendants misappropriating her funds without her consent to engage medical and legal professionals to petition for her to be stripped of her rights under a fraudulently imposed guardianship.

86.    Lori Schiller alleged that she was unable to communicate with Ms. Hunter for months prior to the Wells Fargo Guardianship Petition being filed. However, Lori Schiller continued to make payments using Ms. Hunter's funds at her personal discretion, including paying $60,000 to Dr. Rami Kaminski and wiring $21,077.26 to Bernie Young and his company, Bernie Young Entertainment Enterprises, LLC, while failing and/or willfully refusing to satisfy other debts owed by Ms. Hunter, which, based upon Lori Schiller's statement, were all actions taken by Lori Schiller and Wells Fargo without confirming with Ms. Hunter whether any incoming invoices or outgoing payments were or were not legitimate and authorized. A true and correct copy of the December 2, 2021 Wells Fargo transaction notice, which has been redacted in accordance with Fed. R. Civ. P. 5.2 and SDNY ECF Rules & Instructions § 6, is attached hereto as **Exhibit L**; *see also* **Exhibit C**.

87.    Bernie Young, who was hired as a pseudo-manager for Ms. Hunter by Debmar, engaged in unauthorized financial activities using Ms. Hunter's funds. On or about January 10, 2022, Bernie Young used Ms. Hunter's AMEX card to pay Abrams Fensterman, LLP $10,000 for legal services to file a guardianship petition against Ms. Hunter—again without Ms. Hunter's knowledge or authorization.

88.    Abrams Fensterman, LLP's attorney Carolyn Wolf acted as counsel to Bernie Young in connection with Bernie Young's guardianship cross-petition, which Carolyn Wolf filed

with the court on or about March 11, 2022 (the "Young Guardianship Cross-Petition") and which Judge Lisa Sokoloff also presided over. *See* **Exhibit C** at p. 39, evidencing the unauthorized $10,000 charge by Bernie Young to Ms. Hunter's AMEX card; true and correct copies of the police reports that Ms. Hunter filed with the City of Miami Police Department and the New York Police Department for fraud and grand larceny by a dishonest employee against Bernie Young for the unauthorized use of her AMEX card, which have been redacted in accordance with Fed. R. Civ. P. 5.2 and SDNY ECF Rules & Instructions § 6, are attached hereto as **Exhibit M**.

89.     Bernie Young also instructed or permitted his employee, Leah Abraham, to misappropriate Ms. Hunter's funds for expenses that Ms. Hunter did not authorize. Leah Abraham was provided access to a separate AMEX card attached to Ms. Hunter's account, giving Leah Abraham access to Ms. Hunter's funds. Despite lacking any professional relationship with Ms. Hunter, Leah Abraham used this card, with Bernie Young's knowledge and Lori Schiller's full awareness, for various expenses with an unknown purpose. *See* **Exhibit C** at pp. 15, 29-30, and 44.

90.     As Ms. Hunter's financial advisor, Lori Schiller had knowledge of these unauthorized transactions and did not take any action to protect Ms. Hunter's financial interests. Instead of reporting any suspected exploitation, Wells Fargo and Lori Schiller used Ms. Hunter's personal and financial information—without a court order—to support the guardianship petition.

91.     In defiance of internal policies and regulatory rules, Wells Fargo neither followed its own elder abuse protocols nor notified the Financial Industry Regulatory Authority (FINRA) or any regulatory body about its suspicion about Ms. Hunter being financially abused. A true and correct copy of Ms. Hunter's FINRA complaints against Wells Fargo and Ms. Schiller, which outlines each direct violation, is attached hereto as **Exhibit N**.

92.     Not once did Wells Fargo or Lori Schiller, as a "concerned party," report suspected financial abuse to Adult Protective Services (APS) in Florida, where Ms. Hunter resided at the time.

93.     Because Wells Fargo was a financial institution operating within the state of Florida, Lori Schiller also violated state law by failing to report her suspicion to the Florida Department of Children and Families' Central Abuse Hotline.

*Targeted Harm to Ms. Hunter's Son and Family*

94.     To ensure control over Ms. Hunter and to weaken any objection by Ms. Hunter to Judge Lisa Sokoloff imposing the guardianship, Defendants engaged in a concerted effort to erode Ms. Hunter's trust in her son and alienated their relationship.

95.     At the time the guardianship petitions were filed, Ms. Hunter had a valid Florida Power of Attorney, prepared and executed in accordance with Florida law. These documents designated Ms. Hunter's son, Kevin Hunter, to make decisions on her behalf in the event of incapacity. A true and correct copy of Ms. Hunter's Durable Power of Attorney is attached hereto as **Exhibit O**.

96.     On or about March 11, 2022, without notice to Ms. Hunter, Judge Lisa Sokoloff suspended Ms. Hunter's Florida Power of Attorney and health care directive without a jurisdictional analysis. This non-judicial action was taken in clear absence of jurisdiction and without any finding of incapacity or procedural safeguards.

97.     Upon information and belief, serious questions arise concerning the impartiality and propriety of the assignment of Ms. Hunter's guardianship proceeding to Judge Lisa Sokoloff. The manner in which this sensitive matter was designated to Judge Sokoloff prompts inquiry into whether the assignment was the result of a fair and impartial random selection process, or

conversely, if it constituted a targeted designation designed to achieve a predetermined outcome adverse to Ms. Hunter's interests and rights.

98.    Wells Fargo, Lori Schiller, David Pikus, Linda Redlisky, Phillip Solomon, and Sabrina Morrissey vilified Ms. Hunter's son, Kevin Hunter, telling Ms. Hunter that her son was fraudulently accessing her accounts. Interestingly, at no point was the misappropriation of Ms. Hunter's funds by Wells Fargo, Lori Schiller, Bernie Young, or Leah Abraham shared with Ms. Hunter.

99.    Despite being a beneficiary of Ms. Hunter's estate plans and an intended heir, Kevin Hunter was cut off from financial support and personal communication with his mother, causing lasting harm. The actions of Defendants—including Sabrina Morrissey's withholding of payments and Lori Schiller's misrepresentation of account status—constitute intentional interference with familial association and negligent infliction of emotional distress. Defendants' actions have resulted in financial and reputational harm to Ms. Hunter and Kevin Hunter.

100.    Wells Fargo and Lori Schiller were aware of Ms. Hunter's intention to purchase a residence in Miami for her son's continued housing while pursuing higher education. When Ms. Hunter was seeking to retain a real estate agent for the purchase, Lori Schiller advised Ms. Hunter that she knew a real estate attorney that she could retain on Ms. Hunter's behalf to assist with the buying process, which Lori Schiller did.

101.    However, because Wells Fargo initiated the guardianship proceeding, froze Ms. Hunter's accounts, and the guardianship was subsequently imposed, Ms. Hunter lost her down payment on the property, her purchase was voided, and the purchase was converted into a lease—which went unpaid by Wells Fargo, Lori Schiller, and Sabrina Morrissey.

102.    Due to Defendants' mismanagement and their refusal to honor pre-existing obligations—including those previously paid by Lori Schiller and known to Wells Fargo—Kevin Hunter was evicted from his residence in Miami, which Ms. Hunter intended to purchase outright for his continued housing while pursuing higher education, on three separate occasions, resulting in extreme emotional distress, interruption of his academic pursuits, and reputational harm within his professional and social communities. True and correct copies of the publicly filed eviction court documents filed against Kevin Hunter are attached hereto as **Exhibit P**.

*Silencing and Isolating Ms. Hunter through Judicial Orders*

103.    Beginning in February 2022, a coordinated and coercive campaign to silence and isolate Ms. Hunter was executed through judicial orders and extrajudicial acts, depriving Ms. Hunter of access to counsel, family, communication tools, and the ability to control her own narrative. *See* **Exhibit H**.

104.    On or about March 23, 2022, Wells Fargo filed a motion seeking to seal the guardianship matter and to enjoin Ms. Hunter's privately retained counsel, Miami Entertainment Law Group, from representing or even communicating with her.

105.    Shortly thereafter, Ms. Hunter's phone was remotely altered—her counsel's number was deleted from her contacts, and Miami Entertainment Law Group's phone number was blocked, effectively severing her direct access to legal representation.

106.    On or about April 21, 2022, Judge Lisa Sokoloff issued an order prohibiting Ms. Hunter's use of computers, tablets, and other electronic devices.

107.    On or about July 27, 2022, Judge Lisa Sokoloff issued a further order curtailing Ms. Hunter's access to regular telephone service, effectively placing her in near-total technological isolation.

108.    These restrictions were imposed despite the absence of any adjudication of incapacity and without affording Ms. Hunter an evidentiary hearing or an opportunity to contest these life-altering restrictions.

109.    The silencing campaign escalated on or about June 1, 2023, when Judge Lisa Sokoloff issued a judicial order authorizing the public release of Ms. Hunter's private medical information—including the announcement of a diagnosis of frontotemporal dementia—without her informed consent. This order also retroactively authorized HIPAA waivers, waiving Ms. Hunter's fundamental privacy rights. Upon information and belief, the release was strategically timed and intended to support a media narrative reinforcing Ms. Hunter's alleged incapacity, thereby foreclosing public sympathy or legal scrutiny of the guardianship.

110.    Simultaneously, Ms. Hunter's communications with her family and friends were tightly controlled. Phone usage was limited, and visitors—including her son—were required to obtain prior approval from Sabrina Morrissey. Permission was frequently denied or delayed without explanation, further reinforcing Ms. Hunter's social isolation and dependency.

111.    The weaponization of familial relationships ensured that no one close to Ms. Hunter could challenge the guardianship or assist her in asserting her rights.

112.    Adding insult to injury, Defendants used Ms. Hunter's own funds to retain management and public relations agents—William Selby and Shawn Zanotti—who disseminated the narrative that Ms. Hunter was incapacitated and thriving under court supervision. These efforts were not for Ms. Hunter's benefit but were calculated to mislead the public, insulate the guardianship from criticism, and suppress the truth of Ms. Hunter's unlawful confinement and exploitation.

113.    These acts collectively reveal a pattern of deliberate silencing, concealment, and coercion, imposed through judicial imprimatur and carried out by agents of the guardianship enterprise.

*Imposition of the Guardianship and Financial Exploitation*

114.    Upon information and belief, in or around March 2022, in Judge Sokoloff's chambers in New York, New York, Judge Lisa Sokoloff told Ms. Hunter that she would regain access to her finances if she consented to the guardianship. Of course, if a guardian were appointed, the guardian would have access to Ms. Hunter's funds, not Ms. Hunter herself.

115.    Based on Judge Lisa Sokoloff's statement and following the continued deprivation of Ms. Hunter's rights and financial hardships caused by Wells Fargo freezing her accounts and initiating the guardianship proceeding, Ms. Hunter, under immense financial duress and emotional strain, was coerced into consenting to the appointment of a temporary guardian.

116.    On or about March 15, 2022, four days after suspending Ms. Hunter's valid Power of Attorney without due process, Judge Lisa Sokoloff issued an order appointing Sabrina Morrissey as temporary Guardian with plenary control over Ms. Hunter's financial accounts, medical decisions, legal matters, and communication. Judge Lisa Sokoloff imposed the guardianship based on Ms. Hunter's coerced consent and based on deficient or fabricated findings of incapacity, lacking clear and convincing evidence as required by N.Y. Mental Hyg. Law § 81.

117.    Upon information and belief, Judge Lisa Sokoloff routinely appoints Sabrina Morrissey to serve as Guardian in Article 81 proceedings despite Sabrina Morrissey being accused of being a party to a scheme to falsely imprison someone under an oppressive guardianship.[6]

---

[6] *Flomenhaft v. Pieternelle*, No. 159800/2022 (Sup. Ct., N.Y. Cnty. filed Apr. 17, 2023); *see also Morrissey v. A&E Television Networks, LLC*, No. 650893/2024 (Sup. Ct., N.Y. Cnty. filed Sept. 16, 2024).

118.    Following her appointment, Sabrina Morrissey immediately took control of Ms. Hunter's bank accounts, assets, and personal decision-making, including medical treatment and residency. Wells Fargo permitted Sabrina Morrissey to liquidate assets and transfer funds, in violation of internal bank policies and fiduciary obligations.

119.    Despite this unfettered access, Sabrina Morrissey has failed to make timely payments on Ms. Hunter's outstanding obligations and many of Ms. Hunter's financial obligations have gone unattended.

120.    Upon information and belief, despite allegations of financial malfeasance, neither Judge Lisa Sokoloff nor Sabrina Morrissey ordered or conducted a financial audit of Ms. Hunter's financial accounts under the control of Wells Fargo to ascertain the source of alleged improprieties.

121.    As a result of Wells Fargo and Lori Schiller's failure to properly oversee Ms. Hunter's finances compounded with Sabrina Morrissey's lack of proper oversight after her appointment as Ms. Hunter's guardian, Gary Press failed to timely comply with Ms. Hunter's tax obligations, resulting in unnecessary and avoidable tax liabilities, penalties and fees, including an approximate $568,451.57 tax lien from the state of New York for Ms. Hunter's failure to pay taxes for 2019 and 2021. A true and correct copy of the email exchange between Ms. Hunter's counsel and Gary Press regarding Ms. Hunter's tax concerns and efforts to meet with Gary Press is attached hereto as **Exhibit Q**.

122.    Since seizing Ms. Hunter's accounts, Sabrina Morrissey has failed to file all state mandated financial accountings detailing the use and disposition of Ms. Hunter's estate.

123.    Contrary to N.Y. Mental Hyg. Law § 81.25 (2024), Judge Lisa Sokoloff did not require Sabrina Morrissey to post a bond to safeguard Ms. Hunter's multi-million-dollar assets concurrently with the imposition of the guardianship—a basic protection in guardianship law.

124.    Sabrina Morrissey has disposed of a substantial portion of Ms. Hunter's property, including selling Ms. Hunter's New York City condominium on or about May 10, 2024, at a loss exceeding $1 million.

125.    Sabrina Morrissey, acting in her capacity as guardian, willfully refused to disburse funds from a 529 prepaid college fund established by Ms. Hunter for the explicit purpose of covering her son's college-related expenses, including housing. This refusal to honor Ms. Hunter's pre-guardianship financial planning and intent created severe uncertainty and distress for Ms. Hunter's son, causing him to experience significant mental anguish, destabilizing his housing arrangements, and directly interfering with his pursuit of a college education. Upon information and belief, Morrissey's actions were driven by an improper motive to retain these dedicated funds within the guardianship estate and under her exclusive control, which stands in direct contravention of established public policy regarding educational trusts and Ms. Hunter's clearly articulated pre-guardianship decisions regarding the permissible uses of said funds.

126.    Upon information and belief, Sabrina Morrisey has sold a vast majority of Ms. Hunter's personal items, including, but not limited to, priceless artwork, jewelry, luxury designer handbags and high value apparel, which were previously placed in storage due to the sale of Ms. Hunter's real property.

127.    Sabrina Morrissey also sold Ms. Hunter's beloved, rescued cats, Chit Chat and My Way, without Ms. Hunter's knowledge, isolating Ms. Hunter from the much-needed companionship and emotional support.

*Enlisting Handlers to Control Ms. Hunter*

128.    Upon information and belief, in or around September 2022, Sabrina Morrissey directly retained and/or approved the retention of William Selby to serve as Ms. Hunter's manager, despite William Selby having limited to no management experience.

129.    Upon information and belief, Sabrina Morrissey retained William Selby to be Ms. Hunter's handler, including to monitor Ms. Hunter's involvement in the Lifetime docuseries and other media activities.

130.    On or about January 10, 2010, William Selby entered into a mortgage agreement with Wells Fargo for property that William Selby purchased in New Jersey. On or about September 12, 2022, which is around the time that Sabrina Morrissey retained William Selby to be Ms. Hunter's manager, Wells Fargo issued a discharge of William Selby's mortgage, indicating that the debt had been paid in full. True and correct copies of the applicable County of Essex public records are attached hereto as **Exhibit R**.

131.    Upon information and belief, Wells Fargo's discharge of William Selby's mortgage was in exchange for William Selby being Ms. Hunter's handler.

132.    Upon information and belief, Sabrina Morrissey also directly retained and/or approved the retention of Shawn Zanotti to serve as Ms. Hunter's publicist, despite Judge Lisa Sokoloff barring Ms. Hunter from engaging with the press.

133.    Upon information and belief, Sabrina Morrissey retained Shawn Zanotti to be Ms. Hunter's handler, including to monitor her interactions with the press, restrict her ability to communicate publicly about her guardianship, and shape a public narrative designed to conceal ongoing financial and civil rights violations.

134.    Upon information and belief, Shawn Zanotti spearheaded the production of the Lifetime docuseries based upon Ms. Hunter's guardianship and William Selby and Sabrina Morrisey oversaw all activities related to the docuseries.

135.    Despite lacking the authority to do so, William Selby and Shawn Zanotti engaged Ms. Hunter to appear at the Atlanta Women's Expo on or about May 20, 2023. William Selby and Shawn Zanotti also retained a portion of the payment that was received in relation to this commercial contract, which Ms. Hunter never performed.

136.    Upon information and belief, Sabrina Morrissey allowed William Selby and Shawn Zanotti to continue as Ms. Hunter's manager and publicist even after William Selby and Shawn Zanotti entered into a commercial contract on Ms. Hunter's behalf without the authority to do so.

*Unlawful Confinement*

137.    After Sabrina Morrissey sold Ms. Hunter's New York City condominium, Sabrina Morrissey unlawfully confined Ms. Hunter to multiple facilities, including but not limited to, Coterie, a high-cost senior living facility that provides memory care, against Ms. Hunter's will.

138.    Sabrina Morrissey and Coterie have repeatedly invaded Ms. Hunter's privacy, exploited her vulnerable condition for financial gain and isolated her from friends and family. A true and correct copy of Ms. Hunter's New York State Department of Health complaint against Coterie is attached hereto as **Exhibit S**.

139.    All telephone calls and visits with Ms. Hunter, including those from legal counsel, are subject to monitoring and approval by Sabrina Morrissey or her designees, effectively depriving Ms. Hunter of privileged legal communication.

140.    These restrictions violate Ms. Hunter's constitutional rights and further isolate her from her personal support system and ability to seek independent legal recourse.

141.    Amanda Clears, an employee of Coterie serving as Ms. Hunter's care specialist, photographed Ms. Hunter in a state of undress without consent, disclosed Ms. Hunter's location to third parties, and sold or attempted to sell the images and information to media outlets.

142.    Despite being found by healthcare professionals as competent, Ms. Hunter remains under a plenary guardianship and is being involuntarily confined, despite evidence of capacity, a lack of necessity, and multiple procedural and ethical violations throughout the guardianship's establishment and continuation.

## CAUSES OF ACTION

143.    All claims arise out of the same series of transactions and occurrences—i.e., the guardianship scheme—and share common legal/factual questions.

144.    This action is not an appeal of a final state court judgment and does not seek to overturn the guardianship order itself.

145.    This action does not seek to appeal the merits of any state court guardianship determination. Rather, Plaintiffs contend that the guardianship was unconstitutionally initiated, marked by pervasive due process violations and the absence of an essential finding of incapacity. Ms. Hunter initially entered the guardianship under coerced consent, and she is now being unlawfully prevented from terminating it, representing an ongoing deprivation of her liberty and autonomy. Furthermore, Plaintiffs seek prospective and compensatory relief for a series of distinct extrajudicial acts—including the unlawful suppression of counsel, the unauthorized suspension of a valid power of attorney, coerced consent, unlawful use of financial and medical information, and unconstitutional restrictions on liberty and speech—all of which transpired outside the proper scope of any state court adjudication. These combined claims, challenging both the guardianship's unconstitutional inception and its ongoing unlawful maintenance, fall squarely within this Court's

jurisdiction and are not barred by the Rooker-Feldman doctrine, as they assert independent federal causes of action rather than an appeal of a state court judgment. *See Skinner v. Switzer*, 562 U.S. 521, 532 (2011).

<u>**COUNT I – VIOLATION OF DUE PROCESS**</u>
*Fourteenth Amendment and 42 U.S.C. § 1983*
**(Against Morrissey & Morrissey, LLP, Sabrina Morrissey, Wells Fargo, Lori Schiller, Bressler, Amery & Ross, P.C., David Pikus, Abrams Fensterman, LLP, Carolyn Wolf, Solomon's Law Office, P.C., Phillip Solomon, Rafferty & Redlisky, LLP, Linda Redlisky, Law Offices of Salami-Oyakhilome, Sadatu Salami, Judge Adam Silvera, Judge Lisa Sokoloff, and NYAG)**

146.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

147.    At all relevant times, the above-named Defendants, acting individually and/or in concert, deprived Ms. Hunter of her constitutional rights under the Fourteenth Amendment to the United States Constitution, including her rights to procedural and substantive due process, in violation of 42 U.S.C. § 1983—specifically, the deprivation of Ms. Hunter's liberty and property, including the unlawful suspension of a valid Florida power of attorney without jurisdictional authority.

*Jurisdictional Overreach and Improper Invalidation of Power of Attorney*

148.    David Pikus coordinated with judicial actors to seal proceedings without due process.

149.    Judge Adam Silvera sealed Ms. Hunter's Emergency Petition proceeding without a proper hearing or an adequate opportunity for Ms. Hunter to be heard. This ex parte action occurred despite the fundamental rights implicated by Ms. Hunter's Emergency Petition and deprived Ms. Hunter of meaningful access to the courts and public accountability in a matter involving personal liberty and property.

150.    Ms. Hunter executed a valid Florida Power of Attorney, which should have been recognized under the Full Faith and Credit Clause (U.S. Const. art. IV, § 1) and constituted an "available resource" under N.Y. Mental Hyg. Law § 81.03(e), obviating the need for the appointment of a guardian.

151.    Without jurisdiction under Florida law (Fla. Stat. § 709.2109), and without legal justification, Judge Lisa Sokoloff unilaterally suspended this valid document.

152.    Judge Lisa Sokoloff failed to provide Ms. Hunter with proper notice or an adequate opportunity to be heard and to challenge this action before it was implemented in violation of the procedural requirements set forth in Mental Hygiene Law § 81.07.

*Suppression of Legal Representation*

153.    On February 16, 2022, at the first appearance before the court, Ms. Hunter's privately retained attorney was present and ready to advocate on her behalf.

154.    Prior to a judicial finding that Ms. Hunter lacked the capacity to retain counsel or that such representation posed a legal or ethical conflict, Judge Lisa Sokoloff provided no hearing, no record, and no rationale for barring retained counsel from representing Ms. Hunter in the guardianship proceeding in violation of N.Y. Mental Hyg. Law 81.10(a) and the U.S. Constitution.

155.    As a result, Ms. Hunter was denied a fair opportunity to contest the guardianship, respond to allegations, or assert her legal rights through an attorney who was not complicit in the actions of Defendants.

156.    Because Judge Lisa Sokoloff and Sabrina Morrissey have prevented Miami Entertainment Law Group's representation of Ms. Hunter, the matter of Ms. Hunter's Emergency Petition, which is still active, has gone without a hearing and no action has been taken by Judge Lisa Sokoloff or Sabrina Morrissey as to the underlying allegations of Wells Fargo's and Lori

Schiller's breach of fiduciary duties that predicated Ms. Hunter's filing of the Emergency Petition to begin with.

157.    By forcibly barring Ms. Hunter's chosen counsel from effectively advocating on her behalf and participating in the guardianship proceeding, and by appointing Linda Redlisky as Ms. Hunter's counsel *prior* to a Lincoln hearing being held to determine whether Ms. Hunter's retained counsel was chosen freely and independently, Judge Lisa Sokoloff aided in Ms. Hunter receiving ineffective assistance of counsel from Linda Redlisky, and subsequently from Sadatu Salami.

158.    Phillip Solomon, Linda Redlisky, and Sadatu Salami failed to advocate for Ms. Hunter's expressed interests, did not investigate contrary evidence, did not include Ms. Hunter's retained counsel in the advocacy process, and did not ensure the appointment of a guardian was supported by clear and convincing evidence. Their participation resulted in the deprivation of Ms. Hunter's statutory and constitutional rights to meaningful representation and a fair proceeding.

159.    David Pikus, Carolyn Wolf, Phillip Solomon, Linda Redlisky, and Sadatu Salami each contributed to the exclusion of Ms. Hunter's counsel, including by failing to serve or include Ms. Hunter's retained counsel in all guardianship communications with the court.

160.    Defendants' actions resulted in Ms. Hunter's involuntary confinement, seizure of her assets, and prolonged deprivation of constitutionally protected interests.

*Lack of Evidentiary Basis and Judicial Bias*

161.    Lori Schiller and Wells Fargo froze Ms. Hunter's accounts and coordinated the guardianship petition using the Kaminski Letter—a fabricated document unsupported by a medical examination, testing, or patient interaction—thereby depriving her of access to property and legal resources without due process of law.

162.    David Pikus prepared and filed the Wells Fargo Guardianship Petition relying on misrepresented evidence.

163.    Ms. Hunter was denied the right to testify, to submit medical evidence from her treating physicians, or to present expert opinions in her favor.

164.    When Ms. Hunter was allegedly diagnosed with frontotemporal dementia in or around 2023, Ms. Hunter was not permitted to obtain an independent evaluation of her current medical condition to dispute the finding.

165.    Judge Lisa Sokoloff instituted the guardianship without clear and convincing evidence of incapacity, without a fair adversarial process, without an independent medical evaluation, and without consideration of less restrictive alternatives, in violation of New York law and federal constitutional standards, imposing unlawful and unjustified restraints on Ms. Hunter's physical liberty and seized property without legal authority.

166.    Judge Lisa Sokoloff, under the color of law, also deprived Ms. Hunter of her due process rights due to her overt judicial bias and animus toward Ms. Hunter.

167.    Judge Lisa Sokoloff publicly belittled Ms. Hunter's media career, stated that she had more famous AIPs with more money than Ms. Hunter, and expressed disdain based on Ms. Hunter's public persona, undermining the appearance of impartiality and justifying judicial recusal.

168.    In addition, individuals involved in the guardianship proceeding, including Linda Redlisky and Wells Fargo, made political contributions to Judge Lisa Sokoloff's reelection campaign, giving rise to an appearance of impropriety and bias.

*Failure to Implement Statutory Safeguards*

169.    Ms. Hunter was not provided with adequate notice, an opportunity to be heard, or legal representation of her choosing during the initiation and maintenance of the guardianship.

170.    As such, the guardianship was imposed without satisfying the procedural requirements of N.Y. Mental Hyg. Law § 81.07, which mandates proper notice, opportunity to retain counsel, and a finding of incapacity supported by clear and convincing evidence.

171.    Despite the substantial value of Ms. Hunter's estate, Judge Lisa Sokoloff failed to require that Sabrina Morrissey post a fiduciary bond as a safeguard to prevent and address potential financial mismanagement or misconduct pursuant to N.Y. Mental Hyg. Law § 81.25. Judge Lisa Sokoloff's omission eliminated a vital statutory safeguard designed to protect the assets of vulnerable individuals.

172.    As a direct result of Defendants' failure to enforce these and other procedural protections, Ms. Hunter's liberty was taken, her property was mismanaged, her tax obligations neglected, and her financial autonomy entirely revoked.

173.    These failures constituted a denial of procedural due process, as Ms. Hunter was deprived of liberty and property without the safeguards required by the Constitution. The denial of a fair hearing, suppression of legal representation, and unilateral invalidation of executed legal documents under color of state law amount to a clear violation of the Due Process Clause.

*Continuing Harm and Unlawful Confinement*

174.    Ms. Hunter remains confined at Coterie without legal basis.

175.    Sabrina Morrissey and Coterie have continuously denied Ms. Hunter freedom of movement, access to counsel, meaningful communication and visits with loved ones, and the right to manage her own affairs.

176.     Judge Lisa Sokoloff has refused to consider recent medical evaluations restoring capacity and continues to suppress filings submitted on Ms. Hunter's behalf.

177.     These actions—taken by state actors, court officers, attorneys, private actors, and fiduciaries—were coordinated under color of law, and resulted in the ongoing deprivation of Ms. Hunter's liberty, property, and constitutional protections without due process.

178.     As a direct result of Defendants' acts, omissions, policies, and practices complained of herein, Ms. Hunter has not been permitted to independently manage her finances, communicate freely, or pursue legal redress. Ms. Hunter has suffered unlawful deprivation of property and financial control, emotional distress, loss of liberty through involuntary confinement, and continued denial of due process in judicial proceedings.

179.     Plaintiffs seek declaratory relief and damages under 42 U.S.C. § 1983 for the irreparable harm suffered by Ms. Hunter, including the loss of agency over financial and legal decisions. Plaintiffs also seek relief before an unbiased judiciary declaring that Defendants' acts, omissions, policies, and practices complained of herein are prohibited by the Due Process Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 and seek the relief and damages set forth in the prayer for relief.

**COUNT II – VIOLATION OF FREE SPEECH AND ACCESS TO COURTS**
***First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983***
**(Against Morrissey & Morrissey LLP, Sabrina Morrissey, Wells Fargo, Bressler, Amery & Ross, P.C., David Pikus, Abrams Fensterman, LLP, Carolyn Wolf, Solomon's Law Office, P.C., Phillip Solomon, Rafferty & Redlisky LLP, Linda Redlisky, Law Offices of Salami-Oyakhilome, P.C., and Sadatu Salami, Judge Adam Silvera, and Judge Lisa Sokoloff)**

180.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

181.    Defendants, acting under color of state law, restricted Ms. Hunter's right to free speech and to access the courts by barring her chosen counsel, restraining or censoring her communications, and limiting her access to legal and public platforms.

182.    Morrissey & Morrissey, LLP, Bressler, Amery & Ross, P.C., Abrams Fensterman, LLP, Solomon's Law Office, P.C., Rafferty & Rafferty LLP, and Law Offices of Salami-Oyakhilome are vicariously liable for aiding and abetting or substantially assisting in the violation of Ms. Hunter's due process rights, having knowingly contributed to a broader scheme that operated to her legal and personal detriment.

*Freedom of Speech*

183.    Judge Lisa Sokoloff and Sabrina Morrissey subjected and will continue to subject Ms. Hunter to harassment, discipline, and threats of discipline based on the content and viewpoint of Ms. Hunter's speech and attempts to publicly challenge her guardianship, violating Ms. Hunter's rights under the Freedom of Speech Clause of the First Amendment of the United States Constitution.

184.    Judge Lisa Sokoloff and Sabrina Morrissey have systematically imposed and will continue to impose prior restraints to Ms. Hunter's speech.

185.    Judge Lisa Sokoloff and Sabrina Morrisey restricted and will continue to restrict Ms. Hunter's freedom to speak openly about the guardianship and related matters.

186.    Judge Lisa Sokoloff has retaliated against Ms. Hunter, her friends, and her family for speaking publicly and asserting her legal rights.

187.    Upon information and belief, Judge Lisa Sokoloff threatened Ms. Hunter's son with incarceration if he were to discuss the guardianship proceeding with any individual, even his legal representative.

188.    Upon information and belief, Judge Lisa Sokoloff impermissibly threatened to report attorney LaShawn Thomas to the Florida Bar should Ms. Thomas engage in communication with Ms. Hunter and her son, notwithstanding the unequivocal presentation of a formal Acknowledgement of Representation, signed by Ms. Hunter, duly affirming Ms. Thomas' retention as Ms. Hunter's counsel of record.

189.    Sabrina Morrissey monitored or blocked and will continue to monitor or block Ms. Hunter's communications with friends, family, and legal counsel.

190.    Judge Lisa Sokoloff and Sabrina Morrisey's restriction on Ms. Hunter, Ms. Hunter's representatives, and Ms. Hunter's family's speech did not and will not reasonably advance any legitimate or compelling government interest.

191.    These restrictions were imposed without lawful justification and with the intent to silence criticism, shield misconduct, and prevent external scrutiny.

192.    Plaintiffs' speech about the guardianship and related matters did not cause, and could not reasonably have been expected to cause, a substantial and material disruption or interfere with the rights of others.

193.    Judge Lisa Sokoloff and Sabrina Morrisey's acts and omissions have chilled and silenced Ms. Hunter, Ms. Hunter's representatives, and Ms. Hunter's family from exercising their freedom of speech guaranteed to them by the First Amendment of the United States Constitution, in fear that they will be disciplined and retaliated against for engaging in future First Amendment activities.

*Access to Courts*

194.    At the request of David Pikus, and without a proper hearing or opportunity to be heard by Ms. Hunter, Judge Adam Silvera entered an order to seal the matter regarding Ms.

Hunter's Emergency Petition. Defendants acted in concert to deny the public access to the record and any related filings to conceal their enterprise of defrauding Ms. Hunter.

195.    Phillip Solomon failed to properly investigate the claims made within the Wells Fargo Guardianship Petition and the Young Guardianship Cross-Petition.

196.    Phillip Solomon failed to act as an impartial party when evaluating Ms. Hunter's mental and physical capacity.

197.    Phillip Solomon failed to investigate the veracity of the Kaminski Letter and to make an application to the Court for permission to inspect Ms. Hunter's medical records and records of psychological or psychiatric examinations of her treating physicians.

198.    Phillip Solomon failed to interview all of Ms. Hunter's caregivers and treating physicians.

199.    Phillip Solomon failed to impartially review the veracity and truthfulness of documents submitted in support of the claims made within the Wells Fargo Guardianship Petition and the Young Guardianship Cross-Petition, including medical records and financial records.

200.    Phillip Solomon failed to take the steps necessary to preserve Ms. Hunter's property and money against the danger of waste, misappropriation, or loss.

201.    Linda Redlisky and Sadatu Salami failed to advocate for Ms. Hunter's interests.

202.    Neither Linda Redlisky nor Sadatu Salami requested and/or demanded that an independent medical examination of Ms. Hunter be performed prior to the guardianship being imposed.

203.    Neither Linda Redlisky nor Sadatu Salami submitted testimony from Ms. Hunter's treating physicians as evidence to establish her capacity or ability to make reasoned decisions on her own.

204.    Neither Linda Redlisky nor Sadatu Salami challenged the veracity or truthfulness of the Kaminski Letter, essentially rubber-stamping the guardianship.

205.    Neither Linda Redlisky nor Sadatu Salami properly advised Ms. Hunter of the implications of being under a guardianship, whether a temporary guardianship or a full guardianship, which resulted in Ms. Hunter's involuntary confinement, loss of legal agency, and seizure of her assets.

206.    Neither Sabrina Morrissey, Linda Redlisky, nor Sadatu Salami petitioned for Ms. Hunter's guardianship to be lifted after a recent medical evaluation found Ms. Hunter's mental capacity to be intact.

207.    Linda Redlisky filed papers in support of Wells Fargo's motion to institute a gag order regarding Ms. Hunter's guardianship proceeding, ignoring Ms. Hunter's requests to speak freely regarding the matter and dismissing the irreparable harm that a secret guardianship proceeding by bad actors purporting to be concerned parties would have on Ms. Hunter's personal and professional life.

208.    Sadatu Salami failed to object to or challenge the gag order, ignoring Ms. Hunter's requests to speak freely regarding the matter and dismissing the irreparable harm that a secret guardianship proceeding by bad actors purporting to be concerned parties would have on Ms. Hunter's personal and professional life.

209.    Despite no legal finding of incapacity, Judge Lisa Sokoloff, with the support of Defendants, enjoined Ms. Hunter's retained counsel from representing Ms. Hunter,  participated in ex parte communications and court proceedings in a manner that denied Ms. Hunter her constitutional right to be represented by counsel of her own choosing, denied Ms. Hunter's retained counsel service of process of legal documents, and enforced a gag order that prohibited Ms. Hunter

and her representatives from speaking publicly about her condition or attending media interviews concerning the proceedings.

210.    Defendants intentionally and with deliberate indifference, acted in concert to (i) deny Ms. Hunter the ability to retain or communicate with private legal counsel of her choice, (ii) prevent Ms. Hunter from participating meaningfully in legal proceedings; (iii) interfere with Ms. Hunter's access to court filings or representation; and (iv) retaliate or discriminate against Ms. Hunter based on her exercise of protected rights.

211.    As a direct result of Defendants' acts, omissions, policies, and practices complained of herein, Ms. Hunter has suffered damages because of the restrictions to her freedom of speech and being denied access to counsel of her choice and therefore to the courts, in violation of the First and Fourteenth Amendments of the United States Constitution.

212.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein are prohibited by of the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983 and seek the injunctive relief and/or damages set forth in the prayer for relief.

### COUNT III – UNLAWFUL ISOLATION, DENIAL OF FAMILY ASSOCIATION RIGHTS, AND INTERFERENCE WITH LEGAL COUNSEL
*First Amendment, Fourteenth Amendment, 42 U.S.C. § 1983, and N.Y. Const. art. I §§ 6, 11*
**(Against Morrissey & Morrissey LLP, Sabrina Morrissey, Judge Lisa Sokoloff, Atria Senior Living, Inc., and Coterie)**

213.    Plaintiffs incorporate by reference all preceding paragraphs as fully set forth herein.

214.    This claim arises not from the existence of the guardianship itself, but from the conditions imposed under color of state law, whereby Defendants unlawfully isolated Ms. Hunter, interfered with her legal representation, and denied her meaningful contact with family and friends

in violation of Ms. Hunter's rights under the First and Fourteenth Amendments to the United States Constitution and Article I, §§ 6 and 11 of the New York Constitution.[7]

215.    Since February 2022, Judge Lisa Sokoloff and Sabrina Morrissey have systematically restricted Ms. Hunter's access to family, friends, and legal advisors.

216.    As Ms. Hunter's court-appointed Guardian, Sabrina Morrissey acted with the approval or ratification of Judge Lisa Sokoloff, or, in the alternative, Judge Lisa Sokoloff knew or should have known of Sabrina Morrissey's actions and permitted them to continue.

*Unlawful Isolation and Denial of Family Association Rights*

217.    Sabrina Morrissey forcibly placed Ms. Hunter in Coterie without medical necessity or court finding that such confinement was the least restrictive alternative as required by N.Y. Mental Hyg. Law § 81.22(a)(9).

218.    This restriction to Ms. Hunter's liberty constitutes false imprisonment, as Ms. Hunter is confined without valid legal justification, medical recommendation, or court review— thus violating her substantive due process rights.

219.    Coterie has placed Ms. Hunter under 24/7 surveillance and has prohibited Ms. Hunter from being able to freely leave the facility or refuse services.

220.    Coterie has required that all of Ms. Hunter's visitors, including legal counsel, must obtain prior approval from Sabrina Morrissey.

221.    Coterie has denied visitation access to Ms. Hunter's family and friends, and Coterie has even gone as far as falsely telling Ms. Hunter's visitors that she was not a resident at the facility.

---

[7] Under federal law, a state actor may not isolate a competent adult, interfere with familial relationships, or suppress legal access for reasons unrelated to medical need or lawful adjudication. *See Troxel v. Granville*, 530 U.S. 57 (2000) (recognizing a constitutional right to familial association); *Bounds v. Smith*, 430 U.S. 817 (1977) (right of access to the courts).

222.    The persistent isolation imposed upon Ms. Hunter is not in furtherance of her best interests but rather part of a coordinated effort to suppress her voice, prevent public scrutiny, and maintain control over her assets and person.

223.    Ms. Hunter's isolation lacks any lawful basis, violates clear statutory safeguards under New York's guardianship law (N.Y. Mental Hyg. Law §§ 81.03(e), 81,22(a)) and constitutes a direct infringement of her federal constitutional rights.

224.    Sabrina Morrisey, acting under color of state law, interfered with and ultimately severed the familial bond between Ms. Hunter and her only child by isolating Ms. Hunter, refusing communications, restricting physical access, and imposing financial barriers that led to the collapse of parent-child support structures.

225.    Sabrina Morrissey's interference had the intended and actual effect of damaging the relationship between Ms. Hunter and her son, Kevin Hunter. By severing financial ties and promoting a false narrative of impropriety, Sabrina Morrissey isolated Ms. Hunter from her son, who posed a credible challenge to the necessity and lawfulness of the guardianship.

226.    Sabrina Morrisey's conduct has resulted in permanent emotional trauma, reputational harm, and the denial of a protected familial relationship, all without procedural due process or lawful justification.

*Interference with Legal Counsel*

227.    Judge Lisa Sokoloff and Sabrina Morrissey have jointly taken steps to frustrate Ms. Hunter's ability to secure legal representation of her choice, in violation of N.Y. Mental Hyg. Law § 81.10 and the First and Fourteenth Amendments.

228.    Ms. Hunter's phone calls are monitored and often made in the presence of Sabrina Morrissey or her agents.

229.    Communications with attorneys are intercepted or conducted under surveillance, violating attorney-client privilege and deterring open communication.

230.    Counsel retained by Ms. Hunter and her family have been barred from meeting with her or submitting filings on her behalf.

231.    Efforts to file petitions for review, capacity restoration, or appeals have been obstructed.

232.    Judge Lisa Sokoloff and Sabrina Morrissey have refused to consider evaluations affirming Ms. Hunter's capacity or permit her to challenge her confinement.

233.    These practices violate Ms. Hunter's rights to access the courts, receive unimpeded legal counsel, and preserve the confidentiality of her communications as guaranteed by N.Y. Mental Hyg. Law § 81.10, the First Amendment, and *Gideon v. Wainwright*, 372 U.S. 355 (1963).

234.    As a direct result of Defendants' acts, omissions, policies, and practices complained of herein, Ms. Hunter has been subjected to prolonged involuntary confinement, unjustified interference with her relationships with family and friends, the inability to defend herself in guardianship and related proceedings, and deterioration of her emotional health due to isolation and surveillance.

235.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein are prohibited by of the First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983 and Article I §§ 6 and 11 of the New York Constitution and seek the injunctive relief and/or damages set forth in the prayer for relief.

## COUNT IV – VIOLATION OF AMERICANS WITH DISABILITIES ACT (ADA)
### *42 U.S.C. §§ 12101 et seq. and § 504 of the Rehabilitation Act of 1973*
**(Against Morrissey & Morrissey LLP, Sabrina Morrissey, Solomon's Law Office, P.C., Phillip Solomon, Rafferty & Redlisky, LLP, Linda Redlisky, and Judge Lisa Sokoloff)**

236.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

237.    Ms. Hunter is a qualified individual with a perceived disability under the ADA and Defendants discriminated against Ms. Hunter based on her perceived disability and denied Ms. Hunter reasonable accommodations.

238.    In addition to failing to provide Ms. Hunter with reasonable accommodations, Judge Lisa Sokoloff and court-appointed agents subjected Ms. Hunter to a plenary guardianship without due process or individualized assessment, violating ADA requirements for reasonable accommodations as articulated under 42 U.S.C. § 12132 and the Rehabilitation Act § 504.

239.    Defendants assumed incapacity based on the false representations about Ms. Hunter's mental capacity within the Kaminski Letter in violation of Title II of the ADA (42 U.S.C. § 12132).

240.    Defendants failed to engage in an interactive process with Ms. Hunter to determine reasonable accommodations.

241.    Defendants relied on disability stereotypes and unsubstantiated allegations of incapacity, resulting in Ms. Hunter being presumed incapacitated without individualized assessment or exploration and implementation of less restrictive alternatives like supported decision-making.

242.    Once confined, Ms. Hunter was denied rehabilitative services by her long-time treating physicians, meaningful interactions with friends and family, or therapeutic care, including the emotional support of her cats that were sold without her knowledge.

243.    Not only have Defendants failed to provide adequate programming, counseling, recreation, or other rehabilitative treatment for Ms. Hunter, compounding the punitive nature of the guardianship, while held in isolation from her family and friends, Ms. Hunter has experienced extreme loneliness, among other potentially debilitating emotional and psychological problems.

244.    Providing Ms. Hunter with reasonable accommodations would not impose an undue hardship on Defendants.

245.    Defendants' actions discriminated against Ms. Hunter by denying her equal access to legal processes, autonomy, and public life in violation of Title II of the ADA.

246.    Defendants' discrimination and denial of accommodation was because of Ms. Hunter's perceived disability, resulting in the unlawful institution of the permanent guardianship.

247.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein are prohibited by the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973 and seek the relief and/or damages as set forth in the prayer for relief.

**COUNT V – VIOLATION OF CIVIL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) CLAIM / RICO CONSPIRACY**
*18 U.S.C. § 1962(c) and (d)*
**(Against All Defendants, with the exception of NYAG)**

248.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

249.    Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 and 1962 by committing two or more related predicate acts as defined by 18 U.S.C. § 1961(1), which include wire fraud, mail fraud, obstruction of justice, financial exploitation, bank fraud, theft from an interstate financial institution, witness tampering and retaliation, monetary

transactions in criminally derived property, and conspiracy in furtherance of an unlawful guardianship scheme targeting Ms. Hunter.

250.    Defendants formed and engaged in an enterprise—within the meaning of 18 U.S.C. § 1961(4)—comprising of individuals and entities acting in concert for the common purpose of financially exploiting, isolating, and controlling Ms. Hunter and her assets. This enterprise operated continuously over multiple years and maintained an ongoing structure and economic motivation, satisfying the definition of an association-in-fact enterprise under *Boyle v. United States*, 556 U.S. 938 (2009).

**Parties and Roles in the Enterprise**

251.    The association-in-fact enterprise consists of individuals and entities who shared the common purpose of seizing control over Ms. Hunter's person and property under color of law, for personal financial enrichment, reputational gain, and control over her assets.

252.    The parties to this association-in-fact enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) included, but were not limited to, Sabrina Morrissey, Wells Fargo, Lori Schiller, AMEX, David Pikus, Bernie Young, Leah Abraham, Carolyn Wolf, Gary Press, William Selby, Shawn Zanotti, Dr. Rami Kaminski, Phillip Solomon, Linda Redlisky, Sadatu Salami, Judge Adam Silvera, Judge Lisa Sokoloff, Coterie, and Amanda Clears.

253.    The following entities are vicariously liable for aiding and abetting or substantially assisting in the enterprise, having knowingly contributed to a broader scheme that operated to her legal and personal detriment: Morrissey & Morrissey, LLP, Bressler, Amery & Ross, P.C., Debmar, Bernie Young Entertainment Enterprises, LLC, Abrams Fensterman, LLP, Sacks, Press & Lacher, P.C., Rami Kaminski M.D. P.C., Solomon's Law Office, P.C., Rafferty & Rafferty LLP, Law Offices of Salami-Oyakhilome, and Atria Senior Living, Inc.

254.    These individuals and their respective entities associated formally and informally to carry out the common objective of seizing Ms. Hunter's financial assets, isolating her from support systems, and exploiting guardianship processes to generate legal, medical, and management fees.

## Predicate Acts Under 18 U.S.C. § 1961(1)

255.    Each Defendant knowingly agreed to participate in the enterprise's affairs through the commission of these predicate acts.

*Wire Fraud (18 U.S.C. § 1343) and Mail Fraud (18 U.S.C. § 1341)*

256.    Defendants, throughout the duration of the unlawful guardianship scheme, used interstate wire communications—including email, electronic bank transfers, and credit card transactions—and interstate mail services to execute a scheme to defraud Ms. Hunter of her property, money, and legal autonomy.

257.    Throughout her tenure as Ms. Hunter's court-appointed Guardian, Sabrina Morrissey participated in wire and/or mail fraud in New York by misrepresenting Ms. Hunter's capacity and finances in the preparation and submission of court filings in connection with court proceedings in the New York Supreme Court, County of New York, and by participating in the orchestration of financial transfers through financial institutions handling Ms. Hunter's assets.

258.    From at least November 2021 through April 2022, Wells Fargo, acting through its employee Lori Schiller, and Lori Schiller individually participated in wire and/or mail fraud from Lori Schiller's home or Wells Fargo's New York office by sending court documents containing false statements about Ms. Hunter's incapacity and financial misrepresentations. Between November 2021 and January 2022, Wells Fargo, acting through its employee Lori Schiller and Lori Schiller individually initiated six unauthorized wire payments totaling $60,000 from Lori

Schiller's home or Wells Fargo's New York office using Ms. Hunter's AMEX card to Dr. Rami Kaminski to procure a fraudulent psychiatric letter. Wells Fargo and Lori Schiller engaged in electronic communications to coordinate the guardianship petition without Ms. Hunter's knowledge and consent to orchestrate the initiation of the unlawful guardianship, secure control of Ms. Hunter's assets, and procure fraudulent medical documentation to justify the scheme.

259.    Throughout the period of the alleged financial exploitation, AMEX participated in wire and/or mail fraud through AMEX's financial systems and operations in the United States by processing unauthorized payments, including to Dr. Rami Kaminski, without verification, by restricting Ms. Hunter's account access without legal justification or proper authorization, and by enabling unauthorized access to Ms. Hunter's credit accounts. AMEX refused to speak directly with or provide updates to Ms. Hunter or her retained counsel, facilitating the enterprise's financial exploitation of Ms. Hunter by contributing to Ms. Hunter's financial vulnerability and lack of transparency and materially aiding in the unlawful guardianship.

260.    Prior to and during the guardianship proceedings in the New York Supreme Court, County of New York, David Pikus participated in wire and/or mail fraud in New York by submitting and/or accepting court filings supported by false medical opinions and misrepresented financial records and by using wire and/or mail services to submit documents—like the Kaminski Letter—to courts and counsel to justify an ex parte guardianship, along with petitions and affidavits containing false representations. David Pikus also engaged in electronic communications to coordinate the guardianship petition to secure the sealing to proceedings and bypass due process safeguards, ensuring the guardianship's swift and uncontested imposition based on fabricated claims.

261.    Prior to and during the guardianship proceedings in the New York Supreme Court, County of New York, Bernie Young and Leah Abraham participated in wire and/or mail fraud in New York in relation to Ms. Hunter's financial accounts and through communications that initiated legal proceedings by facilitating unauthorized financial decisions and making unauthorized charges to Ms. Hunter's credit accounts and misappropriating funds for personal use. Bernie Young also used Ms. Hunter's own funds to retain Abrams Fensterman LLP and Carolyn Wolf to file a guardianship petition against Ms. Hunter and engaged in electronic communications to coordinate this petition to aid in the financial exploitation central to the guardianship scheme, gain control over Ms. Hunter's estate for personal and professional gain, and fund the legal actions against Ms. Hunter without her consent.

262.    Prior to and during the guardianship proceedings in the New York Supreme Court, County of New York, Carolyn Wolf participated in wire and/or mail fraud in New York by assisting in filing a fraudulent guardianship petition and by using electronic financial systems to process unauthorized legal payments from Ms. Hunter's AMEX account, despite lacking Ms. Hunter's informed consent. Carolyn Wolf also engaged in electronic communications to coordinate the guardianship petition and submitted and/or accepted court filings supported by false medical opinions and misrepresented financial records and by using wire and/or mail services to submit documents to courts and counsel to justify an ex parte guardianship, along with petitions and affidavits containing false representations.

263.    Over multiple years leading up to and during Ms. Hunter's guardianship in New York, Gary Press participated in wire and/or mail fraud at his accounting firm, Sacks, Press & Lacher, P.C., in New York by failing to detect and report anomalies in Ms. Hunter's financial accounts and concealing financial mismanagement. Gary Press failed to timely prepare and file

Ms. Hunter's tax returns for multiple years, resulting in penalties and legal expenses that damaged Ms. Hunter's estate, and concealed critical information from Ms. Hunter or her retained counsel about the status of her taxes or finances despite a fiduciary obligation, leading to Ms. Hunter's financially destabilization and aiding the broader guardianship scheme in concealing financial exploitation, loss of control, and fraud from oversight.

264.    During the period of Ms. Hunter's isolation and confinement under the guardianship in New York, William Selby and Shawn Zanotti participated in wire and/or mail fraud in New Jersey and/or New York by entering and benefiting from unauthorized commercial contracts using Ms. Hunter's likeness in connection with public relations and commercial ventures without Ms. Hunte's meaningful consent. William Selby and Shawn Zanotti also facilitated financial arrangements for their own benefit to further the enterprise's goals of concealment, financial control, and reputational profiteering by commercializing Ms. Hunter's persona while concealing her lack of autonomy.

265.    Prior to and during the initiation of the guardianship proceedings in the New York Supreme Court, County of New York, Dr. Rami Kaminski participated in wire fraud from his medical practice, Rami Kaminski, M.D., P.C., in New York by issuing a medical letter without a supporting basis, such as an evaluation or medical records, to Wells Fargo and Lori Schiller and by engaging in electronic communications to coordinate the guardianship petition to provide the primary fraudulent medical evidence to justify the unlawful guardianship and the deprivation of Ms. Hunter's liberty and property, furthering the enterprise's fabricated incapacity claims.

266.    Throughout the guardianship proceedings in the New York Supreme Court, County of New York, Phillip Solomon, Linda Redlisky, Sadatu Salami, and Judge Lisa Sokoloff participated in wire and/or mail fraud in New York by submitting and/or accepting court filings to

courts and counsel based on insufficient inquiry or verification and supported by false medical opinions and misrepresented financial records to justify an ex parte guardianship, along with petitions and affidavits containing knowingly false representations. Billing statements and retainer letters were also used to invoice Ms. Hunter's estate without authorization to perpetuate the guardianship for financial gain and control over Ms. Hunter's person and property by enabling the enterprise's continued exploitation under the guise of legal and judicial authority.

267.    Throughout Ms. Hunter's unlawful conferment, Coterie participated in wire and/or mail fraud at their facility in New York by accepting payments for Ms. Hunter's confinement from misappropriated funds while failing to address ongoing misconduct by its employees, permitting unlawful isolation and surveillance, and ignoring prior complaints about Ms. Hunter's restricted communications, financially benefiting from Ms. Hunter's unlawful confinement and aiding the enterprise in retaining control over Ms. Hunter's person and assets.

268.    During Ms. Hunter's unlawful confinement, Amanda Clears participated in wire and/or mail fraud at Coterie in New York by taking inappropriate and non-consensual photographs of Ms. Hunter in a state of undress, by disclosing Ms. Hunter's location to third parties, by transmitting unlawful images for profit to third-party media outlets to publicly degrade and silence Ms. Hunter through fear, isolation, and shame, thereby advancing the goals of the enterprise.

*Obstruction of Justice (18 U.S.C. § 1503)*

269.    At the initiation of the guardianship proceedings in the New York Supreme Court, County of New York, David Pikus obstructed justice in New York by participating in the process to seal Ms. Hunter's Emergency Petition without providing proper notice or hearing to Ms. Hunter or her retained counsel, thereby bypassing due process safeguards to ensure the guardianship's

swift and uncontested imposition and to insulate the unlawful guardianship from public and legal scrutiny.

270.     Throughout the guardianship proceedings in the New York Supreme Court, County of New York, Sabrina Morrissey, David Pikus, Carolyn Wolf, Phillip Solomon, Linda Redlisky, Sadatu Salami, and Judge Lisa Sokoloff obstructed justice in New York and within various legal and judicial processes to maintain control over the legal process by taking active measures to exclude or assist in excluding Ms. Hunter's retained legal counsel from participating in the guardianship proceedings—despite no formal finding of incapacity or hearing on the matter—thereby eliminating opposition and enabling uncontested judicial orders that financially and personally benefited members of the enterprise.

271.     During his court-appointed investigation as Court Evaluator of the guardianship proceedings in the New York Supreme Court, County of New York, Phillip Solomon obstructed justice in New York by submitting a biased recommendation for guardianship and facilitating the appointment of a guardian without conducting an independent review and without investigating contrary medical evidence or financial impropriety committed by Wells Fargo, Lori Schiller, Bernie Young, and Leah Abraham. Phillip Solomon also failed to request an independent medical evaluation or permission to inspect medical records to lend judicial credibility to a fraudulent and coercive proceeding and to ensure the imposition of the guardianship without meaningful opposition or a thorough review of the facts.

272.     At the outset of the guardianship proceedings in the New York Supreme Court, County of New York, Judge Adam Silvera obstructed justice in New York by facilitating concealment of rights violations, by acting outside the scope of judicial authority, by sealing Ms. Hunter's Emergency Petition without notice or hearing to obstruct judicial review and insulate the

unlawful guardianship from public and legal scrutiny, thereby enabling the deprivation of Ms. Hunter's rights.

273.    Throughout the guardianship proceedings in the New York Supreme Court, County of New York, Judge Lisa Sokoloff obstructed justice in New York by denying due process and directing that filings be withheld from Ms. Hunter's retained counsel, ensuring uncontested control over the process, and by imposing the guardianship based primarily on the unsupported and unverified Kaminski Letter, without requiring independent corroborating evidence, thereby enabling and concealing the enterprise's activities, facilitating the deprivation of Ms. Hunter's rights under the guise of judicial authority, and protecting the enterprise from public and legal scrutiny.

274.    Throughout Ms. Hunter's confinement, Sabrina Morrissey and Coterie obstructed justice within the Coterie facility in New York by restricting Ms. Hunter's legal access and communication with her legal counsel, family, and press contacts, and by failing to report or prevent abuses related to her confinement to prevent legal challenges and disclosure of the enterprise's illicit activities and to ensure that the conditions of Ms. Hunter's confinement remained hidden.

*Financial Exploitation*

275.    During Sabrina Morrissey's time as Ms. Hunter's court-appointed Guardian, Sabrina Morrissey engaged in systemic financial exploitation in New York by indiscriminately selling Ms. Hunter's assets, including her real property at a substantial loss, and restricting her communications and movements without legal justification. Sabrina Morrissey also used financial control as a tool of coercion by failing to make rent payments for Ms. Hunter's son's Miami residence, willfully refusing to honor Ms. Hunter's judicially approved Marital Settlement

Agreement, targeting Ms. Hunter's son to maintain control over Ms. Hunter's person and estate, destabilize Ms. Hunter's family, inflict hardship upon her son, and maintain leverage over Ms. Hunter by threatening the security and wellbeing of her only child and closest relative.

276.    Throughout the period of the alleged financial improprieties, AMEX aided and abetted financial exploitation through AMEX's financial systems and operations in the United States by refusing to restore Ms. Hunter's access to her credit accounts without legal justification and by failing to investigate fraudulent charges, thereby contributing to Ms. Hunter's financial vulnerability to facilitate the enterprise's scheme by enabling unauthorized access to Ms. Hunter's credit accounts and restricting her legitimate financial control.

277.    Prior to and during the guardianship proceedings in the New York Supreme Court, County of New York, Bernie Young engaged in financial exploitation in New York in relation to Ms. Hunter's finances and professional relationships by misappropriating Ms. Hunter's funds and executing contracts relating to Ms. Hunter's media or public image management or other professional services after he was no longer officially retained. By exploiting his prior relationship with Ms. Hunter and initiating a retaliatory guardianship petition using her own funds, Bernie Young gained personal and professional benefits.

278.    Prior to and during the guardianship proceedings in the New York Supreme Court, County of New York, Leah Abraham engaged in financial exploitation in New York in connection with Ms. Hunter's credit accounts and public representation by fraudulently holding herself out to the public as Ms. Hunter's Chief of Staff despite Bernie Young no longer being Ms. Hunter's manager and Ms. Hunter having no affiliation with Bernie Young Entertainment Enterprises, LLC. Leah Abraham also made unauthorized charges to Ms. Hunter's credit accounts and

misappropriated funds for personal use to aid in the financial exploitation central to the guardianship scheme.

279.    Over multiple years leading up to and during the guardianship, Gary Press engaged in financial exploitation in relation to Ms. Hunter's financial records at his accounting firm, Sacks, Press & Lacher, P.C. in New York by abandoning his fiduciary duty for personal or institutional gain, by failing to timely prepare and file Ms. Hunter's tax returns, by concealing critical information from Ms. Hunter or her retained counsel about her financial status for personal or institutional gain, and by financially destabilizing Ms. Hunter, thereby aiding the guardianship scheme.

280.    During Ms. Hunter's guardianship in New York, William Selby and Shawn Zanotti engaged in financial exploitation and public manipulation in New Jersey and/or New York in the context of Ms. Hunter's public image management and financial dealings, by fraudulently misrepresenting Ms. Hunter's public image to conceal the true extent of Ms. Hunter's condition and autonomy. William Selby assumed access to Ms. Hunter's finances and image while facilitating financial arrangements to benefit himself, including the suspicious discharge of a Wells Fargo mortgage at a time when Ms. Hunter was legally restrained, suggesting a financial exchange as part of a broader racketeering scheme. To gain personal and professional exposure and financial gain for her publicity services, Shawn Zanotti facilitated the production of commercial media related to Ms. Hunter without meaningful consent and in coordination with other members of the enterprise to further the enterprise's goal of concealment, financial control, and reputational profiteering.

281.    Throughout the guardianship proceedings in the New York Supreme Court, County of New York, Judge Lisa Sokoloff facilitated financial exploitation in New York by issuing judicial

orders affecting Ms. Hunter's assets and by issuing guardianship orders unsupported by evidence, leading to the unauthorized disposition and control of Ms. Hunter's assets to enable the enterprise's continued control and financial benefit from Ms. Hunter's estate.

282.    Throughout Ms. Hunter's confinement, Coterie participated in financial exploitation at their facility in New York by aiding in Ms. Hunter's continued unlawful confinement in their facility, accepting payments for her care while permitting her isolation and surveillance, and ignoring complaints regarding misconduct to financially benefit from Ms. Hunter's confinement and to assist the enterprise in maintaining control over her person and assets.

283.    During Ms. Hunter's confinement, Amanda Clears participated in financial exploitation at Coterie in New York by selling images of Ms. Hunter in a state of undress to tabloids, which were taken inappropriately and without consent, and conspiring with another staff member for theft from residents to gain personal profit and to publicly degrade Ms. Hunter, thereby silencing Ms. Hunter through fear, isolation, and shame, advancing the enterprise's goals.

*Bank Fraud (18 U.S.C. § 1344)*

284.    At the initiation of the guardianship and throughout the period of alleged financial improprieties, Wells Fargo, acting through its employee Lori Schiller, and Lori Schiller individually engaged in a scheme at Wells Fargo branches and through interstate banking systems to obtain unauthorized access to Ms. Hunter's assets by (a) freezing accounts without legal cause or regulatory basis; (b) withdrawing and transferring large sums for unauthorized medical and legal purposes; and (c) falsely representing these withdrawals as necessary fiduciary actions under state law.

*Theft from an Interstate Financial Institution (18 U.S.C. § 2113)*

285.    At the initiation of the guardianship in New York and throughout the period of alleged financial improprieties, Wells Fargo, acting through its employee Lori Schiller, and Lori Schiller individually misappropriated funds held in federally insured accounts at Wells Fargo branches and through interstate banking systems by diverting assets to third parties under false pretenses to unlawfully transfer Ms. Hunter's funds to benefit the enterprise and its members.

*Witness Tampering and Retaliation (18 U.S.C. § 1512)*

286.    Prior to the filing of the Wells Fargo Guardianship Petition in the New York Supreme Court, County of New York, throughout the guardianship proceedings, and following the imposition of the guardianship, Sabrina Morrissey, Lori Schiller, David Pikus, Bernie Young, Carolyn Wolf, Phillip Solomon, Linda Redlisky, and Judge Lisa Sokoloff isolated Ms. Hunter in New York from her support system, legal team, and press contacts to prevent legal challenges and disclosure of the enterprise.

287.    Sabrina Morrissey's confinement of Ms. Hunter within Coterie is a means to control Ms. Hunter and to prevent Ms. Hunter from mounting effective legal challenges, to prevent the disclosure of the enterprise's illicit activities, and to protect the enterprise from public and legal scrutiny by (a) cutting off phone access and censoring communications and (b) threatening continued confinement or deprivation of rights if Ms. Hunter spoke publicly.

*Monetary Transactions in Criminally Derived Property (18 U.S.C. § 1957)*

288.    During Sabrina Morrissey's time as Ms. Hunter's court-appointed Guardian in New York, Sabrina Morrissey engaged in monetary transactions involving criminally derived property in relation to the liquidation of Ms. Hunter's assets in New York and other jurisdictions by disposing of Ms. Hunter's property, including real estate, luxury items, and pets, converting

proceeds without court oversight or financial accountings as required under N.Y. Mental Hyg. Law § 81.

289.    Prior to and during the guardianship proceedings in the New York Supreme Court, County of New York, Bernie Young engaged in monetary transactions involving criminally derived property in relation to Ms. Hunter's financial accounts by using Ms. Hunter's financial assets without Ms. Hunter's knowledge or authorization to retain legal services for the purpose of initiating and perpetuating the guardianship against Ms. Hunter, gain control over her estate, and benefit personally and professionally from the scheme.

*Privacy Violations*

290.    During the period leading up to the filing of the Wells Fargo Guardianship Petition in the New York Supreme Court, County of New York, Dr. Rami Kaminski violated Ms. Hunter's privacy from his medical practice in New York by making unauthorized disclosures to Wells Fargo and Lori Schiller of Ms. Hunter's protected health information, including providing the Kaminski Letter to Wells Fargo and Lori Schiller without Ms. Hunter's consent, to provide false justification for the guardianship and to facilitate the deprivation of Ms. Hunter's liberty and property.

291.    During Ms. Hunter's confinement, Amanda Clears violated Ms. Hunter's privacy at Coterie in New York by taking inappropriate and non-consensual photographs of Ms. Hunter in a state of undress and allegedly sold these images for profit to publicly degrade Ms. Hunter, gain personal profit, and silence Ms. Hunter through fear, isolation, and shame—advancing the goals of the enterprise. Amanda Clears exploited Ms. Hunter by making unauthorized disclosures of Ms. Hunter's protected health information and location to third parties, including media outlets.

*Conspiracy (18 U.S.C. § 1962(d))*

292.    All Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to facilitate the unlawful guardianship scheme through the commission of at least two predicate acts. The conspiracy extended over multiple years, operating continuously and was not isolated or sporadic across various interconnected locations and domains including New York courts, financial institutions, law firms, accounting firms, management companies, medical facilities, and personal residences, leveraging interstate communications through coordinated actions among financial institutions, medical professionals, accountants, managers, publicists, attorneys, and court officers to defraud Ms. Hunter, impose a guardianship using deceptive means and without valid basis, suppress her legal rights, facilitate control over her person and property, unlawfully confine her, and exploit her image to publicly degrade and silence her. Each Defendant played a critical role in the commission and concealment of these predicate acts to enrich the enterprise and maintain ongoing control over Ms. Hunter's person and estate.

293.    The enterprise was not a short-term conspiracy, but a longstanding structure with roles, relationships, and illicit gains tied to the imposition and maintenance of guardianship. Each Defendant played a critical role in the commission and concealment of predicate acts in furtherance of the common objective.

294.    Because of their scheme, Ms. Hunter suffered substantial injury to her person, business, and property as a direct result of Defendants' conduct and racketeering enterprise.

295.    Ms. Hunter was injured in her business and property by (a) the misappropriation of her personal and business assets, (b) the denial of contractual income streams and financial support to designated beneficiaries, (c) legal costs and depletion of estate assets directly traceable to Defendants' racketeering activities, (d) loss of control over her financial accounts and assets,

including the unlawful liquidation of real estate and personal property, (e) conversion of funds from bank and credit accounts for unauthorized legal and medical services, (f) unpaid taxes and incurred penalties due to deliberate mismanagement by individuals appointed by or part of the enterprise, and (g) loss of future business opportunities, including the inability to engage in public appearances, media productions, or endorsements, due to reputational damage and coerced confinement.

296.    Mr. Hunter was injured in his business and property by (a) the denial of contractual and judicially approved income streams, (b) legal costs and depletion of assets directly traceable to Defendants' racketeering activities, and (c) loss of future business opportunities due to reputational damage caused by the enterprise's smear campaign against him and his son.

297.    These harms are compensable under RICO because they are tangible property losses and are directly traceable to the pattern of predicate acts, including wire fraud, mail fraud, obstruction of justice, financial exploitation, bank fraud, theft from an interstate financial institution, witness tampering and retaliation, monetary transactions in criminally derived property, and conspiracy, used to advance the enterprise.

298.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein constitute violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), pursuant to 18 U.S.C. § 1962(c) and § 1962(d). Plaintiffs further seek treble damages, attorney's fees, and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT VI – VIOLATION OF THE TRUTH IN LENDING ACT (TILA) / BANK MALFEASANCE
### *15 U.S.C. §§ 1601 et seq.*
### (Against Wells Fargo and AMEX)

299.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

300.    Wells Fargo, acting in its capacity as custodian of Ms. Hunter's financial accounts, violated its obligations under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 et seq., and engaged in broader malfeasance inconsistent with its fiduciary and statutory duties as a banking institution.

301.    Wells Fargo, through the self-serving actions and statements of its agent, Lori Schiller, permitted and facilitated the unauthorized use of Ms. Hunter's AMEX card to pay $60,000 to Dr. Rami Kaminski for a conclusory medical letter, which was then used to support Wells Fargo's guardianship petition against Ms. Hunter. These charges were not approved by Ms. Hunter and were made without her knowledge, violating the TILA's requirement that credit be extended only with clear consumer consent (15 U.S.C. § 1637(a); 12 C.F.R. § 1026.6).

302.    Upon being made aware of unauthorized charges and misuse of Ms. Hunter's funds, Wells Fargo failed to timely investigate, reverse, or report the disputed transactions as required under 15 U.S.C. §§ 1666 and 1666i. The bank did not act on Ms. Hunter's designated representative's inquiries.

303.    Wells Fargo froze Ms. Hunter's accounts, refused to provide account statements or transaction histories, failed to investigate Ms. Hunter's claims of malfeasance committed by a Wells Fargo employee, and barred Ms. Hunter or her legal representatives from accessing her account statements. These actions were taken without legal justification and directly obstructed Ms. Hunter's right to review and dispute account activity.

304.    Wells Fargo, in its capacity as a financial institution, engaged in impermissible consumer lending and credit practices and engaged in the impermissible discontinuance of historical payments for which Ms. Hunter had established regular disbursements. This abrupt and unauthorized cessation of payments, concerning her financial obligations, was effected without

proper notice or justification, thereby violating principles of transparency and fair dealing inherent in TILA and its implementing regulations.

305.   As a financial institution entrusted with Ms. Hunter's assets, Wells Fargo failed to adhere to basic banking standards, ignored red flags of financial exploitation, failed to police and/or investigate the actions of its employee in response to an account holder's claims of misappropriation of authority and control, and acted in concert with co-defendants to support and finance a guardianship petition that it stood to benefit from by continuing to control Ms. Hunter's assets.

306.   Wells Fargo failed to provide statutorily required disclosures concerning the terms, conditions, and use of Ms. Hunter's credit accounts, in violation of 15 U.S.C. §§ 1631 and 1632. Disclosures that were made were misleading or insufficiently clear to permit Ms. Hunter to protect her interests.

307.   Wells Fargo's actions constituted an unwarranted interference with Ms. Hunter's established financial arrangements and caused her direct and proximate harm, including but not limited to, the disruption of critical financial obligations and potential adverse credit implications.

308.   Wells Fargo's actions were not lawful under TILA, but also amounted to gross bank malfeasance, financial exploitation, and abuse of a vulnerable adult.

309.   AMEX, acting at the direction of non-court-appointed third parties, including Lori Schiller, unlawfully restricted Ms. Hunter's access to her own credit accounts—effectively disabling her from managing personal and business affairs. These actions were taken without a valid court order and without notifying Ms. Hunter, constituting a violation of her contractual and statutory rights under TILA.

310.    AMEX failed to timely investigate, reverse, or report disputed transactions and/or unusual charges to Ms. Hunter's credit accounts.

311.    As a direct and proximate result of these violations, Ms. Hunter suffered substantial financial loss, damage to her credit reputation, unlawful confinement supported by misappropriated financial records, and emotional distress.

312.    AMEX failed to timely investigate, reverse, or report disputed transactions and/or unusual charges to Ms. Hunter's credit accounts.

313.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein constitute violations of the Truth in Lending Act (TILA), pursuant to 15 U.S.C. § 1640, punitive damages for willful violations, attorneys' fees and costs, and further seek the relief and/or damages as set forth in the prayer for relief.

### COUNT VII – VIOLATION OF THE FAIR CREDIT REPORTING ACT (FCRA)
### *15 U.S.C. §§ 1681s-2 and 1681i*
### (Against Wells Fargo and Lori Schiller)

314.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

315.    Wells Fargo and Lori Schiller violated the Fair Credit Reporting Act (FCRA) by taking egregious and unlawful adverse financial actions against Ms. Hunter, without providing proper notice, due process, or any meaningful opportunity to defend her financial interests. These actions were not isolated incidents but formed a crucial part of the broader scheme to unjustly control Ms. Hunter's finances and property under an unconstitutionally established guardianship, thereby constituting a clear and deliberate deprivation of her fundamental property and due process rights.

316.    Specifically, at the direction and request of Lori Schiller, Wells Fargo unilaterally froze Ms. Hunter's accounts and unlawfully withheld her funds. This withholding of funds implemented in the absence of any judicial finding of incapacity served as a critical coercive tactic, instrumental in forcing Ms. Hunter's consent to the guardianship. Furthermore, upon information and belief, Wells Fargo proceeded to report these adverse financial actions to credit agencies without providing Ms. Hunter with any of the statutorily required notices, thereby preventing her from exercising her fundamental right to correct errors or dispute these erroneous and damaging adverse reports.

317.    As a direct result of Defendants' acts, omissions, policies, and practices complained of herein, Ms. Hunter's financial obligations were severely disrupted and her credit reputation was significantly damaged.

318.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein constitute violations of the Fair Credit Reporting Act (FCRA), pursuant to 15 U.S.C. §§ 1681s-2 and 1681i and further seek the relief and/or damages as set forth in the prayer for relief.

### COUNT VIII – VIOLATION OF THE GRAMM-LEACH-BLILEY ACT (GLBA) / FINANCIAL EXPLOITATION
*15 U.S.C. §§ 6802–6803*
**(Against Wells Fargo and Lori Schiller)**

319.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

320.    Wells Fargo and Lori Schiller improperly disclosed Ms. Hunter's nonpublic personal financial information (NPI) to initiate or support the guardianship without Ms. Hunter's consent and outside legal exceptions.

321.     Wells Fargo and Lori Schiller improperly used AMEX bank records and transaction data in court petitions without Ms. Hunter's knowledge or authorization. Significantly, Wells Fargo did not assert any malfeasance in Ms. Hunter's accounts held directly with Wells Fargo, nor did they provide copies of any financial records from Wells Fargo accounts detailing such malfeasance. Instead, Defendants' claims to initiate or support the guardianship were solely based upon AMEX records and the self-serving statements of Wells Fargo employee Lori Schiller to the court, further demonstrating the lack of a legitimate basis for their actions and the impropriety of the disclosures.

322.     Wells Fargo and Lori Schiller used bank records and transaction data in court petitions without Ms. Hunter's knowledge or authorization.

323.     Wells Fargo failed to provide opt-out rights or notify Ms. Hunter of this disclosure prior to filing the Wells Fargo Guardianship Petition.

324.     These actions were taken not for legitimate banking services, but to support a guardianship that primarily benefited the disclosing parties and others involved in the alleged scheme.

325.     Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein constitute violations of the Gramm-Leach-Bliley Act (GLBA), pursuant to 15 U.S.C. §§ 6802–6803, and further seek the relief and/or damages as set forth in the prayer for relief.

## COUNT IX – TORTIOUS INTERFERENCE WITH CONTRACTUAL OBLIGATIONS
### (Against Wells Fargo, Lori Schiller, and Sabrina Morrissey)

326.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

*Marital Settlement Agreement*

327.    Ms. Hunter was a party to a valid and enforceable Marital Settlement Agreement (MSA) with Mr. Hunter, approved by a court of competent jurisdiction.

328.    Wells Fargo and Lori Schiller had actual knowledge of the binding financial obligations contained within the MSA, as they were entrusted with managing the very accounts from which these financial obligations were regularly fulfilled.

329.    Despite that knowledge, and critically, prior to any judicial finding of incapacity or the imposition of guardianship, Defendant Lori Schiller unilaterally directed Wells Fargo to freeze Ms. Hunter's accounts and disrupt payments due to Mr. Hunter under the MSA. These actions were taken without the permission of the presiding judge in the divorce proceeding and without Ms. Hunter's authorization or consent. Upon information and belief, upon her appointment, Sabrina Morrissey, without seeking permission from the divorce court regarding Ms. Hunter's financial affairs, continued this disruption of payments, demonstrating a concerted effort to interfere with the MSA without proper authority.

330.    Sabrina Morrissey continued the pattern of wrongful interference by willfully refusing to ensure that the MSA payments were made and resumed, despite having the legal authority and fiduciary duty to do so.

331.    Sabrina Morrissey's continued nonpayment further breached Ms. Hunter's contractual obligations and deprived Mr. Hunter of legally mandated payments.

332.    The actions of Wells Fargo, Lori Schiller, and Sabrina Morrissey were intentional and unjustified and caused actual and consequential damages to Mr. Hunter, including financial losses, legal expenses, and emotional distress.

333.     Upon information and belief, these actions, which were taken unilaterally by Wells Fargo, Lori Schiller and Sabrina Morrisey, were initiated without the permission of the presiding judge in the divorce proceeding and without Ms. Hunter's authorization or consent.

334.     Defendants' interference had the intended and actual effect of damaging the fragile but improving post-divorce relationship between Ms. Hunter and Mr. Hunter. By severing financial ties and promoting a false narrative of hostility, Defendants isolated Ms. Hunter from one of her most long-standing supporters, who posed a credible challenge to the necessity and lawfulness of the guardianship.

335.     As a direct and proximate result of Defendants' tortious interference, Ms. Hunter has been forced to incur significant legal expense to defend this extra judicial action.

336.     As a direct and proximate result of Defendants' tortious interference, Mr. Hunter was deprived of payments he was legally entitled to receive and forced to incur legal and personal expense to enforce his rights.

*Real Estate Agreement*

337.     Sabrina Morrissey deliberately withheld qualified rent payments for Kevin Hunter to exert control over Ms. Hunter's son, using the threat of eviction as coercion to suppress challenges to her authority.

338.     As a result of Sabrina Morrissey's actions, Kevin Hunter was evicted from his residence in Miami on three separate occasions, resulting in extreme emotional distress, interruption of his academic pursuits, and reputational harm within his professional and social communities.

339.     The conduct of Defendants constituted a deliberate and malicious effort to obstruct contractual obligations, alienate familial relationships, and consolidate control over Ms. Hunter's personal, financial, and legal affairs.

340.     As a direct and proximate result of Defendants' tortious interference, Ms. Hunter's son, Kevin Hunter, was deprived of the stable living arrangements he was legally entitled to receive and forced to suffer legal and personal harm.

341.     Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein tortiously interfered with a valid, legally binding agreement and Plaintiffs seek all damages recoverable under New York law, including compensatory damages, and the relief and/or damages as set forth in the prayer for relief.

## COUNT X – BREACH OF THIRD-PARTY BENEFICIARY RIGHTS
### (Against Sabrina Morrissey)

342.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

343.     Mr. Hunter was an intended third-party beneficiary of the court-approved MSA between Mr. Hunter and Ms. Hunter, which required that certain financial obligations continue after their divorce.

344.     Kevin Hunter was an intended third-party beneficiary of the court-approved MSA between Mr. Hunter and Ms. Hunter and a Qualified Tuition Program created upon Ms. Hunter's authorization, which required that all financial obligations that were incurred by her son while in college were to continue after the divorce of his parents, inclusive of rent payments.

345.     As the court-appointed guardian of Ms. Hunter's person and property, Sabrina Morrissey had a legal and fiduciary duty to comply with and administer all court-ordered and contractual obligations.

346. Sabrina Morrissey, acting without direction from Ms. Hunter and contrary to Ms. Hunter's express legal obligations, unilaterally suspended these obligations without judicial authorization, consent, or explanation. Sabrina Morrissey's actions directly caused Ms. Hunter to breach her contractual obligations to Mr. Hunter and Kevin Hunter under the MSA and the Qualified Tuition Program.

347. As a direct and proximate result of Sabrina Morrissey's breach, Mr. Hunter was deprived of money owed to him, incurred unnecessary legal expense, and suffered reputational harm due to the implication that the payment stoppage was based on misconduct.

348. As a further direct and proximate result of Sabrina Morrissey's willful breaches, Ms. Hunter was compelled to violate her own court-ordered and contractual obligations, thereby causing her significant reputational damage, potential legal exposure for non-compliance, inclusive of legal costs and expenses, and profound emotional distress stemming from the forced breach of her agreements.

349. Plaintiffs seek a judgment declaring that Defendant's acts, omissions, policies, and practices complained of herein are a breach of Mr. Hunter's and Kevin Hunter's third-party beneficiary rights and Plaintiffs seek all damages recoverable under New York law, and the relief and/or damages as set forth in the prayer for relief.

## COUNT XI – BREACH OF FIDUCIARY DUTY
**(Against Morrissey & Morrissey LLP, Sabrina Morrissey, Wells Fargo, Lori Schiller, AMEX, Bernie Young, Bernie Young Entertainment Enterprises, LLC, Sacks, Press & Lacher P.C., Gary Press, Rami Kaminski M.D. P.C., Dr. Rami Kaminski, Rafferty & Redlisky LLP, Linda Redlisky, Law Offices of Salami-Oyakhilome P.C., Sadatu Salami, and Amanda Clears)**

350. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

351. Defendants owed fiduciary duties of care, loyalty, and competence to Ms. Hunter as court-appointed guardian, financial/accounting institution and advisor, manager, legal counsel, and care provider.

352. Defendants breached their fiduciary duties by failing to make decisions in the best interests of Ms. Hunter.

*Court-appointed Guardian*

353. Sabrina Morrissey breached her fiduciary duty to Ms. Hunter by failing to accurately file mandatory accountings (in violation of N.Y. Mental Hyg. Law §§ 81.30 and 81.31(a)), liquidating assets, mismanaging Ms. Hunter's assets, failing to ensure that Ms. Hunter's basic needs, such as adequate food and medical care, were met, and engaging in self-dealing, neglect, and abuse of authority.

354. Sabrina Morrisey breached her fiduciary duty to Ms. Hunter by failing to comply with mandatory reporting and accounting obligations, thereby concealing potential financial exploitation and abuse, including, but not limited to selling indiscriminately, including selling Ms. Hunter's real property at a substantial loss and failing to timely meet contractually established or court-ordered payment obligations, including qualified rent payments for Ms. Hunter's son, causing Ms. Hunter to incur tax liabilities and excessive legal fees.

355. Sabrina Morrisey breached her fiduciary duty to Ms. Hunter by repeatedly refusing to timely pay qualified rent for Kevin Hunter, the student beneficiary, in violation of her fiduciary duties, constitutes mismanagement of the 529 account, i.e. the Qualified Tuition Plan, contrary to its intended purpose.

356.    Sabrina Morrissey breached her fiduciary duty to Ms. Hunter by refusing to continue paying for the boarding fees of Ms. Hunter's beloved, rescued cats, Chit Chat and My Way, and subsequently selling Ms. Hunter's cats without her knowledge, consent or approval.

357.    Sabrina Morrissey's conduct reflects a gross abuse of guardianship power and a betrayal of her fiduciary obligations.

*Financial/Accounting Institution and Advisor*

358.    Defendants misused their relationship with Ms. Hunter by exploiting and depleting Ms. Hunter's financial resources and taking financial action (e.g., loans, sales, account transfers) without authority or disclosure.

359.    Wells Fargo and Lori Schiller breached their fiduciary duties to Ms. Hunter by using Ms. Hunter's funds for unauthorized expenses and failing to provide informed consent.

360.    Wells Fargo and Lori Schiller breached their fiduciary duties to Ms. Hunter by failing to adhere to Wells Fargo's own internal policy of reporting suspected elder financial abuse to Adult Protective Services ("APS").

361.    Wells Fargo and Lori Schiller breached their fiduciary duties to Ms. Hunter by using Ms. Hunter's funds, without Ms. Hunter's authorization, to pay Dr. Rami Kaminski for the Kaminski Letter in support of their guardianship petition against Ms. Hunter.

362.    Wells Fargo breached its fiduciary duty to Ms. Hunter by failing to protect Ms. Hunter's assets, depriving her of rightful access to her accounts, and violating financial and accounting rules followed industry wide.

363.    Wells Fargo abused its fiduciary and confidential relationship by pursuing a guardianship against its own customer, thereby creating an inherent conflict of interest, including

a creditor conflict, as it continued to act as a financial institution managing Ms. Hunter's accounts while simultaneously initiating legal action against her.

364.    Lori Schiller breached her fiduciary duty to Ms. Hunter by purportedly retaining a real estate attorney that she knew to handle the purchase of Ms. Hunter's property, constituting self-dealing and an abuse of trust.

365.    AMEX breached its fiduciary duty to Ms. Hunter by acquiescing to Wells Fargo and Lori Schiller's instructions to bar Ms. Hunter from utilizing her credit cards. In doing so, AMEX became complicit in the broader enterprise to isolate, defund, and disempower Ms. Hunter in violation of federal consumer protection statutes and fiduciary principles governing financial institutions.

366.    Gary Press breached his duty to Ms. Hunter by ignoring Ms. Hunter and her legal representative's countless attempts to speak with him about Ms. Hunter's tax filings and by failing to file tax returns and to timely pay monies due to taxing authorities, resulting in Ms. Hunter suffering harm and incurring avoidable tax liabilities and penalties.

*Manager*

367.    Bernie Young breached his fiduciary duty to Ms. Hunter by using Ms. Hunter's funds for unauthorized expenses and by directing his employees/authorized agents, including Leah Abraham, to do the same.

368.    Bernie Young breached his fiduciary duty to Ms. Hunter by using Ms. Hunter's funds, without Ms. Hunter's authorization, to pay Abrams Fensterman, LLP to file a guardianship petition against Ms. Hunter.

*Legal Counsel*

369.    Linda Redliksy and Sadatu Salami breached their fiduciary duties to Ms. Hunter by failing to advocate for Ms. Hunter's best interests.

*Care Provider*

370.    As Ms. Hunter's doctor and as Ms. Hunter's care specialist, Dr. Rami Kaminski and Amanda Clears were in positions of trust and owed Ms. Hunter a fiduciary duty of care, loyalty, and confidentiality.

371.    Dr. Rami Kaminski breached his fiduciary duty to Ms. Hunter by providing a letter purporting to diagnose Ms. Hunter as incapacitated in support of a guardianship petition and disclosing Ms. Hunter's protected health information without her consent.

372.    Amanda Clears breached her fiduciary duty to Ms. Hunter by disclosing confidential health and location information, facilitating unauthorized access by media, profiting from the exploitation of Ms. Hunter, and acting in a manner grossly inconsistent with professional ethical standards and her caregiving obligations.

373.    Defendants' breach of her fiduciary duty of care, loyalty, and confidentiality resulted in harm to Ms. Hunter's health, safety, and personal dignity, as well as financial gain for Amanda Clears.

374.    As a direct result of Defendants' acts, omissions, policies, and practices complained of herein, Ms. Hunter suffered financial loss, reputational damage, and emotional distress.

375.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein are a breach of Defendants' fiduciary duties under New York law and Plaintiffs seek all damages recoverable under New York law, including disgorgement of profits, punitive damages, and the relief and/or damages as set forth in the prayer for relief.

## COUNT XII – CONSTRUCTIVE FRAUD
**(Against Morrissey & Morrissey, LLP, Sabrina Morrissey, Wells Fargo, Lori Schiller, Bernie Young, Bernie Young Entertainment Enterprises, LLC, Gary Press, Sacks, Press & Lacher, P.C., William Selby, Shawn Zanotti, Rami Kaminski M.D. P.C., Dr. Rami Kaminski, Solomon's Law Office, P.C., Phillip Solomon, Rafferty & Redlisky, LLP, Linda Redlisky, Law Offices of Salami-Oyakhilome, Sadatu Salami, and Judge Lisa Sokoloff)**

376.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

377.    At all times relevant hereto, Defendants, through their actions and positions, either held or assumed a position of trust and influence over Ms. Hunter, thereby establishing a confidential or fiduciary relationship.

378.    Defendants, leveraging their respective positions of trust and influence, engaged in actions and omissions designed to deceive Ms. Hunter and the court.

379.    Defendants, individually and collectively, concealed material facts regarding Ms. Hunter's actual capacity and the true necessity and implications of the guardianship proceedings, fostering a false impression that guardianship was in Ms. Hunter's best interest.

380.    Sabrina Morrissey, as Ms. Hunter's court-appointed Guardian, owed Ms. Hunter a fiduciary duty. Sabrina Morrissey misrepresented her actions to the court, failed to disclose material facts about Ms. Hunter's condition, communications, and assets, and knowingly restricted her liberty and financial autonomy for purposes inconsistent with guardianship standards. Sabrina Morrissey's omissions and misuse of funds caused Ms. Hunter severe financial and emotional harm.

381.    Wells Fargo and Lori Schiller, as Ms. Hunter's long-standing financial institution and advisor, had a duty to act in Ms. Hunter's best interest. Wells Fargo and Lori Schiller breached that duty by failing to disclose to Ms. Hunter or her retained counsel the true basis for freezing her accounts and covertly assisted in initiating guardianship proceedings based on unverified claims

84

of incapacity. Lori Schiller knowingly advanced the use of a fraudulent medical letter and other unverified evidence to support the guardianship petition, constituting a material misrepresentation of Ms. Hunter's capacity. Wells Fargo and Lori Schiller omitted key facts while using Ms. Hunter's funds to finance psychiatric fees for the guardianship.

382.    In breach of her fiduciary and confidential duties owed to Ms. Hunter, Lori Schiller made self-serving and misleading statements falsely asserting that Ms. Hunter had purportedly instructed her to take judicial action, including the filing of the Wells Fargo Guardianship Petition, should Lori Schiller perceive Ms. Hunter was being exploited. These statements, made without Ms. Hunter's actual authorization or knowledge, constituted a material misrepresentation and omission of fact, leveraging the trust inherent in the confidential relationship to initiate proceedings that were not genuinely authorized by Ms. Hunter or warranted.

383.    The court relied on these omissions and statements to justify guardianship. Wells Fargo and Lori Schiller benefited from the establishment of guardianship, which facilitated their continued control over Ms. Hunter's assets and potentially insulated them from accountability regarding prior actions.

384.    Bernie Young, as Ms. Hunter's former manager, used their past fiduciary relationship to file a guardianship petition against her using Ms. Hunter's own funds, without disclosure or consent. Bernie Young failed to disclose adverse financial arrangements and misused Ms. Hunter's trust and personal information for his benefit.

385.    Gary Press, as Ms. Hunter's accountant, failed to file tax returns, failed to communicate with Ms. Hunter, and ignored known financial irregularities. Gary Press failed to disclose errors and omissions, leading to avoidable IRS penalties, professional fees, and reputational damage.

386.    William Selby, while holding himself out as Ms. Hunter's authorized representative, entered a position of trust concerning Ms. Hunter's interests. William Selby failed to disclose that he had not been legally authorized to enter into contracts on Ms. Hunter's behalf. William Selby fraudulently entered into contracts on Ms. Hunter's behalf and received direct financial benefit by misrepresenting his authority, causing Ms. Hunter reputational and financial harm. Wells Fargo discharged a mortgage held by William Selby in or around the time that he became involved in the management of Ms. Hunter's affairs, raising strong indicia of a quid pro quo in furtherance of a coordinated enterprise and William Selby's fraudulent representation of Ms. Hunter as her manager.

387.    Shawn Zanotti, acting as Ms. Hunter's purported publicist, assumed a position of influence. Shawn Zanotti exploited Ms. Hunter's likeness in media projects and failed to disclose the extent of Ms. Hunter's incapacity or isolation, fostering a false impression that guardianship was in Ms. Hunter's best interest. Shawn Zanotti acted without proper legal authority and received benefits while concealing material facts from the public and from Ms. Hunter. Shawn Zanotti obtained substantial benefits to her professional standing because of her fraudulent involvement in Ms. Hunter's professional and personal affairs, including the use of her brand identity, financial resources, and reputation to enhance her professional standing within the entertainment industry.

388.    Dr. Rami Kaminski held a position of medical authority and trust. Dr. Rami Kaminski breached his fiduciary and professional obligations by producing a conclusory medical letter, disclosing PHI without consent, and receiving payment from Ms. Hunter's accounts without authorization. Dr. Rami Kaminski benefited by providing the Kaminski Letter, an "expert" assessment that was used to justify a guardianship that deprived Ms. Hunter of fundamental rights.

389.    Phillip Solomon, appointed as Court Evaluator under Mental Hygiene Law § 81.09, breached his duty by failing to conduct an independent investigation and instead recommending guardianship based on false or incomplete information, omitting exculpatory facts regarding Ms. Hunter's mental health and financial condition.

390.    Linda Redlisky, as court-appointed counsel under N.Y. Mental Hyg. Law § 81.10, and Sadatu Salami, as court-approved counsel for Ms. Hunter, owed Ms. Hunter a duty of loyalty. Linda Redlisky and Sadatu Salami materially failed to advocate for Ms. Hunter's expressed wishes, failed to disclose the lack of a proper medical basis for guardianship, and actively aligned with other parties perpetuating her confinement and isolation.

391.    Judge Lisa Sokoloff, acting in her judicial capacity, held a position of paramount trust and authority. Judge Lisa Sokoloff had notice of material due process deficiencies—such as the failure to permit Ms. Hunter's retained counsel to participate—and failed to correct the defects or provide meaningful review.[8] Judge Lisa Sokoloff, acting in her individual capacity, affirmatively and fraudulently induced Ms. Hunter to consent to a temporary guardianship in violation of professional ethics and established basic standards of judicial conduct. After months without access to her assets and defaulting on payment obligations, Ms. Hunter was desperate to regain control of her life and, relying on this misleading inducement, consented to the temporary guardianship under duress. Judge Lisa Sokoloff, by inducing consent to guardianship, maintained judicial control over Ms. Hunter's affairs, potentially avoiding complex legal challenges to the guardianship petition.

[8] While judicial immunity bars most claims, Judge Lisa Sokoloff is included in this cause of action to the extent permitted by law and to preserve the record given that Plaintiffs seek injunctive and declaratory relief concerning ongoing judicial conduct or prospective unconstitutional enforcement of guardianship orders.

392.    Defendants misused positions of trust and influence to deceive Ms. Hunter, concealing material facts about Ms. Hunter's capacity and financial management.

393.    Defendants' receipt of financial benefits, public positioning, and reputation-building came at the direct expense of Ms. Hunter, who was subjected to court-imposed restrictions and isolation. It would be against equity and good conscience to allow the Defendants to retain any of the benefits deriving from the guardianship.

394.    As a result of Defendants' acts, omissions, policies, and practices, the court, relying on these material misrepresentations an omission, was persuaded to justify and impose the guardianship upon Ms. Hunter and Ms. Hunter was wrongfully deprived of property and liberty, incurred legal and administrative expenses, suffered emotional distress and reputational damage, was isolated from family, counsel, and the public, and had her likeness and identity misappropriated for others' gain.

395.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein constitute constructive fraud under New York law and seek the relief and/or damages as set forth in the prayer for relief.

## COUNT XIII - CIVIL CONSPIRACY
### (Against All Defendants with the exception of NYAG)

396.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

397.    Defendants conspired to deprive Ms. Hunter of her rights, including her right to due process, liberty, property, free speech, and access to courts.

398.    Defendants entered into a civil conspiracy to commit unlawful acts for the purpose of gaining control over Ms. Hunter's person and assets under the guise of a state guardianship.

399.    Each Defendant committed overt arts in furtherance of the conspiracy.

400.    Defendants submitted or supported false and misleading court filings (including medical letters, financial affidavits, and petitions) to improperly justify the initiation and continuation of guardianship proceedings over Ms. Hunter.

401.    Defendants blocked access to judicial scrutiny and public oversight by sealing Ms. Hunter's emergency petition and the guardianship proceeding and by instituting a gag order.

402.    Defendants blocked access to independent legal representation by barring Ms. Hunter's retained counsel from participating in court proceedings.

403.    Defendants engaged in financial misappropriation, including unauthorized use of Ms. Hunter's credit cards and accounts to fund legal actions and services directly adverse to her interests.

404.    Defendants engaged in deceptive communications with one another, while concealing material information from Ms. Hunter and her lawful representatives.

405.    Defendants participated in and benefitted from Ms. Hunter's financial exploitation, including payment of unauthorized professional fees, retention of media management services, commercial exploitation of her likeness, disposal of personal and real property, intentional withholding of contractual and court-ordered payments, coordinated efforts to monitor and photograph Ms. Hunter in private settings, and selling images and stories to the media for personal profit.

406.    Defendants coordinated efforts to isolate Ms. Hunter, including barring contact with her family, restricting her communications, and imposing unlawful surveillance and confinement.

407.    Defendants knowingly supported and prolonged a fraudulent guardianship enterprise through coordinated silence, professional neglect, and misuse of institutional authority.

408.    Defendants had a meeting of the minds—whether express or implied—and entered into a coordinated scheme to secure and maintain control over Ms. Hunter's finances, professional image, and personal autonomy for private gain.

409.    Each Defendant committed one or more overt acts in furtherance of this conspiracy, causing substantial and foreseeable harm to Ms. Hunter, including but not limited to: involuntary confinement, misappropriation of property, reputational harm, loss of income, emotional distress, and deprivation of constitutional rights.

410.    Plaintiffs assert that each of the Defendants omitted or facilitated at least one of the predicate torts alleged herein—such as fraud, conversion, breach of fiduciary duty, or abuse of process—and knowingly participated in a common plan to subvert Ms. Hunter's rights and profit from her incapacity and media persona.

411.    As a direct and proximate result of this conspiracy and Defendants' acts, omissions, policies, and practices complained of herein, Ms. Hunter suffered cognizable harm, including ongoing deprivations of her civil rights, commercial losses, and psychological harm.

412.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies and practices complained of herein constitute a conspiracy under New York law and that Defendants are jointly and severally liable for all resulting harms. Plaintiffs seek all damages recoverable under New York law and the relief and/or damages as set forth in the prayer for relief.

## COUNT XIV – CONVERSION
**(Against Morrissey & Morrissey LLP, Sabrina Morrissey, Wells Fargo, Lori Schiller, Bernie Young, Bernie Young Entertainment Enterprises, LLC, and Leah Abraham)**

413.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

414.    Ms. Hunter had an immediate and rightful possessory interest in her personal and financial property, including but not limited to her personal and business bank accounts, her real and personal property—including her home, her emotional support animals, and her financial instruments and credit lines—including business credit cards.

415.    Defendants wrongfully took, withheld, or exercised dominion over Ms. Hunter's personal property, including but not limited to her home, bank accounts, emotional support animals, and financial instruments, without legal justification, consent, or adherence to statutory procedures, including adhering to statutory requirements for property management under guardianship law.

416.    Sabrina Morrissey seized control of Ms. Hunter's assets, real property, and credit accounts, used Ms. Hunter's funds to retain personnel and enter into commercial agreements without proper judicial oversight, and denied Ms. Hunter access to her assets, including preventing rent payments for her Miami property and limiting access to her bank accounts for personal and family use.

417.    Wells Fargo and Lori Schiller intentionally and unlawfully deprived and/or interfered with Ms. Hunter's rightful possession of her bank accounts without Ms. Hunter's consent, constituting conversion under New York common law. Without legal authorization or proper judicial order, Wells Fargo and Lori Schiller unilaterally froze Ms. Hunter's accounts and refused to restore access. They diverted funds from these accounts to third parties—including medical providers—without Ms. Hunter's knowledge or consent. These actions constituted unauthorized control and use of her property.

418.    Bernie Young misappropriated $10,000 from Ms. Hunter's AMEX account to retain Abrams Fensterman, LLP and fund a guardianship petition against Ms. Hunter. This amount was

charged without Ms. Hunter's knowledge or approval and was used for purposes adverse to her interests.

419.    Without Ms. Hunter's knowledge or approval, Leah Abraham participated in the unauthorized use of Ms. Hunter's funds and acted as a proxy for managing Ms. Hunter's finances in a manner inconsistent with her fiduciary duties, including making purchases without authority.

420.    Defendants exercised dominion and control over Ms. Hunter's property in contravention of her rights and before any valid guardianship authority had been granted or before due process was afforded.

421.    At all times relevant hereto, Defendants acted with malice, recklessness and total and deliberate disregard for the contractual and personal rights of Plaintiff.

422.    As a direct and proximate result of this conspiracy and Defendants' acts, omissions, policies, and practices complained of herein, Ms. Hunter suffered direct losses. Ms. Hunter was deprived of the use and benefit of her lawful property, incurred damages, including legal and financial penalties, and was forced to expend resources challenging unlawful guardianship proceedings initiated using her own funds.

423.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein constitute unlawful conversion under New York common law, as recognized by the United States Court of Appeals for the Second Circuit in *Thyroff v. Nationwide Mutual Insurance Co.*, 460 F.3d 400 (2d Cir. 2006). Plaintiffs seek compensatory damages, punitive damages, restitution of converted property, attorneys' fees and costs, and any further relief and/or damages as set forth in the prayer for relief pursuant to CPLR § 3001.

**COUNT XV – NEGLIGENCE / PROFESSIONAL MALPRACTICE**
**(Against Morrissey & Morrissey LLP, Sabrina Morrissey, Wells Fargo, Lori Schiller, Bressler, Amery & Ross, P.C., David Pikus, Bernie Young, Bernie Young Entertainment Enterprises, LLC, Rami Kaminski M.D. P.C., Dr. Rami Kaminski, Rafferty & Redlisky LLP, Linda Redlisky, Law Offices of Salami-Oyakhilome, Sadatu Salami, and Amanda Clears)**

424.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

425.    This claim arises from the collective and individual failures of Defendants—licensed professionals, fiduciaries, medical practitioners, financial institutions, and legal officers—who owed Ms. Hunter legally cognizable duties of care arising from their relationships with her.

426.    Defendants owed Ms. Hunter a cognizable duty to exercise the reasonable degree of skill and care ordinarily possessed by members of their profession, which included protecting her legal, medical, and financial interests under New York common law, professional ethical standards, and statutory obligations.

427.    Each Defendant breached the duty of care owed to Ms. Hunter and their breach constitutes negligence and professional malpractice.

*Breach of Duty by Sabrina Morrissey*

428.    As Ms. Hunter's court-appointed Guardian, Sabrina Morrissey owed a fiduciary duty to act in Ms. Hunter's best interests and to comply with N.Y. Mental Hyg. Law §§ 81.20, 81.22, and 81.25.

429.    Sabrina Morrissey breached that duty by acting outside the scope of authority granted by the court, seizing and misusing personal assets, denying medical autonomy, and restricting communication and the freedom to contact her family and friends without just cause.

430.    Sabrina Morrissey ignored clear and recent medical evidence confirming Ms. Hunter's competence, failing to advocate for her release or for a modification of the guardianship as required.

431.    Sabrina Morrissey disregarded the least restrictive alternative requirement under N.Y. Mental Hyg. Law § 81.03(d), continuing to impose involuntary confinement at Coterie Senior Luxury Living without clinical justification.

432.    Sabrina Morrissey seized and misused Ms. Hunter's assets, failing to file proper accountancy or seek court authorization for major financial decisions.

433.    Sabrina Morrissey imposed isolation measures that restricted Ms. Hunter's access to family, friends, and legal counsel, in direct violation of her rights and guardian duties under N.Y. Mental Hyg. Law § 81.22(a)(6)-(9).

434.    Sabrina Morrissey acted beyond the scope of her legal authority, including decisions relating to medical care, social access, and financial management.

435.    These actions reflect a gross departure from accepted guardianship practices and constitute actionable negligence.

*Breach of Duty by Wells Fargo and Lori Schiller*

436.    Wells Fargo, as a fiduciary financial institution, and Lori Schiller, acting as Ms. Hunter's financial advisor, owed Ms. Hunter the highest standard of care under fiduciary principles and New York banking law.

437.    Wells Fargo and Lori Schiller breached that duty.

438.    Wells Fargo wrongfully froze Ms. Hunter's accounts, restricted her access to funds, and collaborated with non-family third parties—including Lori Schiller—to initiate guardianship proceedings based on unverified and improperly obtained medical information.

439.    Wells Fargo and Lori Schiller acted with gross negligence by relying on unfounded representations of incapacity, failing to verify medical claims, and directly contributing to the imposition of the unlawful guardianship.

440.    Lori Schiller directed payments from Ms. Hunter's account without her knowledge or authorization, including $60,000 to Dr. Rami Kaminski, in violation of her fiduciary duty and ethical rules governing financial professionals.

441.    When Ms. Hunter was in the process of purchasing a property in Miami, Lori Schiller instructed Ms. Hunter not to retain her own real estate agent to assist with the purchase. Instead, Lori Schiller retained a real estate attorney that she knew to handle the transaction. This act was not only an abuse of trust, but directly adverse to Ms. Hunter's interests, constituting self-dealing and breach of fiduciary duty.

442.    These actions constitute breach of fiduciary duty and professional negligence, resulting in financial loss, reputational damage, and loss of autonomy.

*Breach of Duty by David Pikus*

443.    David Pikus owed Ms. Hunter a duty as an officer of the court and as counsel involved in matters materially affecting her liberty and property rights.

444.    David Pikus failed to safeguard Ms. Hunter's due process rights by not advocating for notice and a hearing prior to the sealing of critical court records. His conduct fell below the professional standard of care required of attorneys in high-stakes guardianship matters implicating constitutional interests.

445.    By failing to act with the reasonable skill and diligence expected of attorneys in similar circumstances and directly contributing to the procedural and constitutional harms suffered

by Ms. Hunter, David Pikus breached that duty, constituting professional negligence and legal malpractice.

*Breach of Duty by Bernie Young*

446.    As Ms. Hunter's purported business manager, Bernie Young owed Ms. Hunter a continuing duty of loyalty, honesty, reasonable care, good faith, and competence in managing her professional affairs.

447.    This duty, grounded in their fiduciary relationship, required Bernie Young to act in Ms. Hunter's best interests, avoid conflicts of interest, and refrain from unauthorized use of her assets.

448.    Bernie Young breached that duty by colluding with other Defendants to support the guardianship petition, failing to act in Ms. Hunter's best financial interest, and engaging in mismanagement and exploitation.

449.    Although Bernie Young had ceased his formal role as Ms. Hunter's manager prior to August 2021, Bernie Young continued to hold himself out as Ms. Hunter's authorized representative and exercised control over her finances without legal authority. In doing so, he misrepresented his relationship to third parties and operated under a false pretense of agency.

450.    Bernie Young knowingly misappropriated at least $10,000 of Ms. Hunter's personal funds without her knowledge or consent, to finance the preparation and filing of a guardianship petition against her. This act was not only unauthorized, but directly adverse to Ms. Hunter's interests, constituting self-dealing and breach of fiduciary duty.

451.    Bernie Young failed to verify or investigate allegations regarding Ms. Hunter's mental capacity before initiating an adversarial guardianship proceeding.

452.    Bernie Young declined to pursue or consider less restrictive alternatives, such as supported decision-making, health care proxies, or independent evaluation.

453.    Bernie Young aligned himself with Defendants who stood to gain financially from Ms. Hunter's incapacitation, thereby prioritizing external interests over the welfare of his former client.

454.    These actions reflect professional malpractice, bad faith, and authorized appropriation of client resources and constitute a clear breach of fiduciary principles under New York law, making Bernie Young liable for all resulting damages, including restitution of misappropriated funds, consequential losses, and emotional harm.

*Breach of Duty by Dr. Rami Kaminski*

455.    Dr. Rami Kaminski owed Ms. Hunter a duty of confidentiality in accordance with medical and legal standards.

456.    Dr. Rami Kaminski breached that duty by disclosing confidential medical information and issuing a medical statement without Ms. Hunter's knowledge, consent or authorization.

457.    Dr. Rami Kaminski unlawfully disclosed Ms. Hunter's protected health information to Wells Fargo and Lori Schiller, in violation of the Health Insurance Portability and Accountability Act (HIPAA) (42 U.S.C. 1320d et seq), HIPAA's Privacy Rule (45 C.F.R. § 164.502), and the New York Health Information Privacy Act (NYHIPA), compromising Ms. Hunter's health privacy.

458.    Dr. Rami Kaminski, Lori Schiller, and Wells Fargo collaborated in a grotesque perversion of fiduciary duty, trading Ms. Hunter's autonomy for control over her assets.

459.    Dr. Rami Kaminski's conclusory medical letter lacked any medical reasoning or factual basis, and Dr. Rami Kaminski knew that the letter would be used as the primary basis for the Wells Fargo Guardianship Petition.

460.    Dr. Rami Kaminski did not inform Ms. Hunter of this disclosure or the purpose for which her protected health information was being disclosed.

461.    Dr. Rami Kaminski did not obtain a HIPAA or NYHIPA authorization from Ms. Hunter prior to disclosing Ms. Hunter's protected health information (PHI) to Lori Schiller and Wells Fargo.

462.    These actions violated professional medical ethics, the standards of care in forensic evaluations, and contributed directly to Ms. Hunter's loss of liberty.

463.    As a direct result of Dr. Rami Kaminski's negligent and unauthorized use of Ms. Hunter's PHI, Ms. Hunter suffered financial exploitation, reputational harm, involuntary confinement, deprivation of property, and loss of medical agency.

*Breach of Duty by Linda Redlisky and Sadatu Salami*

464.    Linda Redlisky and Sadatu Salami were each appointed or involved as counsel tasked with protecting Ms. Hunter's interests in the guardianship proceeding.

465.    Linda Redlisky and Sadatu Salami failed to meaningfully investigate the allegations of incapacity, disregarded medical records and evidence from Ms. Hunter's treating physicians, and failed to advocate for less restrictive alternatives.

466.    Despite having a duty under N.Y. Mental Hyg. Law § 81.10(c) to advocate for the client's expressed wishes, they failed to seek Ms. Hunter's input or support her efforts to retain private counsel.

467.    Even after evidence emerged showing Ms. Hunter's capacity, they failed to petition for restoration or advocate for review.

468.    Such failures constitute legal malpractice and breach of ethical obligations under the New York Rules of Professional Conduct.

*Breach of Duty by Amanda Clears*

469.    As a care specialist at Coterie, Amanda Clears acted with gross negligence by deliberately violating internal protocols, statutory duties, and ethical caregiving obligations.

470.    Amanda Clears had a duty of care to Ms. Hunter and Amanda Clears breached that duty by selling unauthorized and inappropriate photographs that she took of Ms. Hunter and disclosing Ms. Hunter's protected health information.

471.    Amanda Clears' actions were not merely careless, but reflected a reckless disregard for Ms. Hunter's physical, emotional, and privacy rights.

472.    Defendants' acts, omissions, policies and practices complained of herein are a substantial departure from accepted professional judgment, standards and practices, constitute punishment, and reflect deliberate indifference to known or obvious consequences to Ms. Hunter, including actual harm and pervasive risk of harm.

473.    Plaintiffs seek a judgment declaring that Defendants' acts, omissions, policies, and practices complained of herein constitute negligence and/or professional malpractice under New York law, as recognized by the United States Court of Appeals for the Second Circuit in *Kimmel v. Schaefer*, 89 F.3d 75 (2d Cir. 1996), and further seek the relief and/or damages as set forth in the prayer for relief, pursuant to CPLR § 3001.

## COUNT XVI – NEGLIGENT HIRING, SUPERVISION OR RETENTION
**(Against Wells Fargo, Bressler, Amery & Ross, P.C., Debmar, Bernie Young Entertainment Enterprises, LLC, Abrams Fensterman, LLP, Sacks, Press & Lacher, P.C., Rami Kaminski M.D. P.C., Solomon's Law Office, P.C., Rafferty & Redlisky LLP, Law Offices of Salami-Oyakhilome, Atria Senior Living, Inc. and Coterie)**

474. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

*Against Wells Fargo*

475. Wells Fargo is vicariously liable for the acts of its employee, Lori Schiller, who acted within the scope of her employment and under the authority of Wells Fargo when she orchestrated a guardianship petition against Ms. Hunter using unlawfully obtained medical information and without proper legal basis.

476. Wells Fargo knew or should have known of Lori Schiller's conflicts of interests and improper methods, including her reliance on a conclusory letter from Dr. Rami Kaminski without medical examination or consent.

477. Wells Fargo failed to adequately supervise Lori Schiller, permitted her to act outside the bounds of ethical and legal standards, and ratified her conduct by filing the guardianship petition in its name.

478. As a result of Wells Fargo's negligence in hiring, retaining, and supervising Lori Schiller, Ms. Hunter suffered deprivation of liberty, financial harm, and reputational injury.

*Against Bressler, Amery & Ross, P.C.*

479. Bressler, Amery & Ross, P.C. is vicariously liable for the actions of its partner, David Pikus, who played a material role in proceedings that resulted in the deprivation of Ms. Hunter's constitutional rights.

480.    David Pikus' failure to uphold the professional and constitutional duties required of counsel constitutes actionable professional negligence.

481.    David Pikus acted within the scope of his employment and authority when he knowingly participated in actions that furthered the unlawful guardianship scheme alleged herein.

482.    David Pikus submitted a letter to the New York County Supreme Court that proposed sealing Ms. Hunter's emergency petition proceeding. Although Ms. Hunter's counsel was copied on the letter, the court entered an order sealing the matter without providing Ms. Hunter or her attorneys a meaningful opportunity to object or be heard, in violation of fundamental due process principles.

483.    As a seasoned practitioner, David Pikus knew or should have known that sealing the record in this context—where Ms. Hunter sought emergency judicial relief and Wells Fargo subsequently petitioned for Ms. Hunter's guardianship—would materially impair Ms. Hunter's access to the courts, suppress public scrutiny and challenges to the legitimacy of Wells Fargo's guardianship petition, and restrict legal redress.

484.    Despite this, David Pikus failed to advise the court or advocate for procedural fairness, and his actions facilitated the entry of an order that unjustly cloaked the guardianship in secrecy.

485.    David Pikus participated in ex parte communications and court proceedings in a manner that denied Ms. Hunter her constitutional right to be represented by counsel of her own choosing.

486.    David Pikus assisted in the exclusion of Ms. Hunter's retained attorney from court appearances without a finding of incapacity or legal conflict.

487.    Bressler, Amery & Ross, P.C. failed to adequately supervise David Pikus, permitted him to act outside the bounds of ethical and legal standards, and ratified his conduct by their continued representation of Wells Fargo in the sealed matter, evidencing its participation in, and benefit from, Ms. Hunter's unconstitutional deprivation of rights.

488.    As a result of Bressler, Amery & Ross, P.C.'s negligence in hiring, retaining, and supervising David Pikus, Ms. Hunter suffered deprivation of liberty, financial harm, and reputational injury.

*Against Debmar*

489.    Debmar is vicariously liable for the acts of its contracted manager, Bernie Young, who acted under color of professional authority and who played a material role in proceedings that resulted in the deprivation of Ms. Hunter's constitutional rights.

490.    Bernie Young acted within the scope of his employment and authority when he knowingly participated in actions that furthered the unlawful guardianship scheme alleged herein.

491.    Bernie Young misappropriated Ms. Hunter's funds and used $10,000 of her own money without her knowledge to initiate a guardianship petition against her.

492.    Debmar failed to adequately supervise Bernie Young's handling of Ms. Hunter's affairs, including access to sensitive financial information and personal contacts, despite knowing or having reason to know of his ongoing misuse of authority.

493.    As a result of Debmar's negligence in hiring, retaining, and supervising Bernie Young, Ms. Hunter suffered deprivation of liberty, financial harm, and reputational injury.

*Against Bernie Young Entertainment Enterprises, LLC*

494. Bernie Young Entertainment Enterprises, LLC is vicariously liable for the acts of its employees/contractors, Bernie Young and Leah Abraham, who acted in concert to exploit Ms. Hunter's personal and financial circumstances.

495. Bernie Young and Leah Abraham acted within the scope of their employment and authority when they knowingly participated in actions that furthered the unlawful guardianship scheme.

496. Bernie Young Entertainment Enterprises, LLC failed to adequately supervise Bernie Young and Leah Abraham's handling of Ms. Hunter's financial information and credit accounts.

497. As a result of Bressler, Amery & Ross, P.C.'s negligence in hiring, retaining, and supervising Bernie Young and Leah Abraham, Ms. Hunter suffered deprivation of liberty, financial harm, and reputational injury.

*Against Abrams Fensterman, LLP*

498. Abrams Fensterman, LLP is vicariously liable for the actions of its partner, Carolyn Wolf, who played a material role in guardianship proceedings that resulted in the deprivation of Ms. Hunter's constitutional rights.

499. Carolyn Wolf acted within the scope of her employment and authority when she knowingly participated in actions that furthered the unlawful guardianship scheme alleged herein.

500. Carolyn Wolf accepted payment from Ms. Hunter's AMEX account—without Ms. Hunter's knowledge or consent—to fund legal services directly adverse to Ms. Hunter's interests.

501.    Carolyn Wolf participated in ex parte communications and court proceedings in a manner that denied Ms. Hunter her constitutional right to be represented by counsel of her own choosing.

502.    Carolyn Wolf assisted in the exclusion of Ms. Hunter's retained attorney from court appearances without a finding of incapacity or legal conflict.

503.    Abrams Fensterman, LLP, as Carolyn Wolf's employer and supervising law firm, owed a duty to ensure its attorneys adhered to ethical and constitutional standards. By failing to do so and by retaining payments derived from misappropriated funds, the firm ratified and materially benefited from the misconduct.

504.    As a result of Abrams Fensterman LLP's negligence in hiring, retaining, and supervising Carolyn Wolf, Ms. Hunter suffered deprivation of liberty, financial harm, and reputational injury.

*Against Sacks, Press & Lacher, P.C.*

505.    Sacks, Press & Lacher, P.C. is vicariously liable for the actions of its partner, Gary Press, who served as Ms. Hunter's certified public accountant during the relevant period.

506.    Gary Press acted within the scope of his employment and authority when he knowingly participated in actions that furthered the unlawful guardianship alleged herein.

507.    While acting under the authority of his firm, Gary Press failed to timely file Ms. Hunter's 2019 and 2021 tax returns, resulting in penalties, fees, and legal and administrative burdens.

508.    Gary Press refused to communicate directly with Ms. Hunter or provide status updates regarding her filings, thereby contributing to her financial vulnerability and further enabling the exploitative control exercised through the guardianship scheme.

509.    Sacks, Press & Lacher, P.C. owed a duty to ensure that Gary Press' engagement as a fiduciary advisor adhered to ethical and constitutional standards. By failing to do so, the firm ratified and materially benefited from the misconduct.

510.    As a result of Sacks, Press & Lacher, P.C.'s negligence in hiring, retaining, and supervising Gary Press, Ms. Hunter suffered deprivation of liberty, financial harm, and reputational injury.

*Against Rami Kaminski M.D. P.C.*

511.    Rami Kaminski M.D. P.C. is vicariously liable for the actions of Dr. Rami Kaminski, who alleged served as Ms. Hunter's psychiatrist during the relevant period and who played a material role in proceedings that resulted in the deprivation of Ms. Hunter's constitutional rights.

512.    Dr. Rami Kaminski acted within the scope of his employment and authority when he knowingly participated in actions that furthered the unlawful guardianship alleged herein.

513.    While acting under the authority of his medical practice, Dr. Rami Kaminski drafted and distributed a medical letter concerning Ms. Hunter, which became the primary basis for the Wells Fargo Guardianship Petition, without Ms. Hunter's consent.

514.    Rami Kaminski M.D. P.C. owed a duty to ensure that Dr. Rami Kaminski's provision of medical services and management of Ms. Hunter's protected health information adhered to ethical and constitutional standards. By failing to do so, the practice ratified his breach of medical ethics and privacy.

515.    As a result of Rami Kaminski M.D. P.C.'s negligence in hiring, retaining, and supervising Dr. Rami Kaminski, Ms. Hunter suffered deprivation of liberty, financial harm, and reputational injury.

*Against Solomon's Law Office, P.C.*

516.    Solomon's Law Office, P.C. is vicariously liable for the actions of its partner, Phillip Solomon, who served as court evaluator in Ms. Hunter's guardianship proceeding and played a material role in proceedings that resulted in the deprivation of Ms. Hunter's constitutional rights.

517.    Phillip Solomon acted within the scope of his employment and authority when he knowingly participated in actions that furthered the unlawful guardianship scheme alleged herein.

518.    Phillip Solomon participated in ex parte communications and court proceedings in a manner that denied Ms. Hunter her constitutional right to be represented by counsel of her own choosing.

519.    Phillip Solomon assisted in the exclusion of Ms. Hunter's retained attorney from court appearances without a finding of incapacity or legal conflict.

520.    Phillip Solomon failed to conduct a competent investigation into Ms. Hunter's condition, declined to review medical records or interview treating physicians, and relied on an unverified letter authored by Dr. Rami Kaminksi without independent corroboration.

521.    Phillip Solomon failed to evaluate or recommend less restrictive alternatives, directly aiding the enterprise in imposing guardianship.

522.    These acts and omissions were undertaken in the course of his official duties and are attributable to Solomon's Law Office, P.C.

*Against Rafferty & Redlisky LLP*

523.    Rafferty & Redlisky, LLP is vicariously liable for the actions of its partner, Linda Redlisky, who served as court-appointed counsel for Ms. Hunter and failed to advocate for her constitutional rights.

524.    Linda Redlisky acted within the scope of her employment and authority when she knowingly participated in actions that furthered the unlawful guardianship scheme alleged herein.

525.    Linda Redlisky participated in ex parte communications and court proceedings in a manner that denied Ms. Hunter her constitutional right to be represented by counsel of her own choosing.

526.    Linda Redlisky assisted in the exclusion of Ms. Hunter's retained attorney from court appearances without a finding of incapacity or legal conflict.

527.    Linda Redlisky deliberately aligned herself with other members of the guardianship enterprise and failed to challenge the adequacy of medical evidence, failed to pursue less restrictive alternatives, and failed to protect Ms. Hunter's right to choose her own counsel.

528.    Linda Redliksy participated in an enterprise that facilitated the unlawful deprivation of Ms. Hunter's liberty and property, and her actions fall squarely within the scope of her official role and thus are attributable to Rafferty & Redlisky LLP.

*Against Law Offices of Salami-Oyakhilome*

529.    The Law Offices of Salami-Oyakhilome is vicariously liable for the actions of its partner, Sadatu Salami, who Ms. Hunter's retained counsel brought in to assist with Ms. Hunter's representation in order to overcome Judge Lisa Sokoloff's attempts to preclude them, and yet who ultimately played a material role in proceedings that resulted in the deprivation of Ms. Hunter's constitutional rights.

530.    Sadatu Salami acted within the scope of her employment and authority when she knowingly participated in actions that furthered the unlawful guardianship scheme alleged herein.

531.    Sadatu Salami participated in ex parte communications and court proceedings in a manner that denied Ms. Hunter her constitutional right to be represented by counsel of her own choosing.

532.    Sadatu Salami assisted in the exclusion of Ms. Hunter's retained attorney from court appearances without a finding of incapacity or legal conflict.

533.    Sadatu Salami failed to provide effective advocacy or act in Ms. Hunter's best interests and instead aligned herself with the enterprise's continued isolation and financial control of Ms. Hunter.

534.    Sadatu Salami's refusal to challenge medical evidence or question the procedural irregularities surrounding the guardianship furthered the unlawful deprivation of Ms. Hunter's rights.

535.    These acts and omissions were undertaken in the course of her professional duties and are attributable to the Law Offices of Salami-Oyakhilome.

*Against Atria Senior Living, Inc. and Coterie*

536.    Executive management at Coterie owed a duty to exercise reasonable care in the hiring, supervision, and retention of staff, including care specialists with access to vulnerable residents.

537.    Despite prior complaints and red flags regarding Amanda Clears' conduct, Coterie failed to conduct a reasonable investigation or implement safeguards.

538.    Coterie's negligence enabled the continuation of the conduct alleged herein and directly contributed to Ms. Hunter's injuries.

539.    Management is therefore vicariously and independently liable for the harm suffered by Ms. Hunter due to its breach of duty.

540.    As a direct and proximate result of the acts committed by Defendants' employees and authorized agents while acting within the scope of their employment and agency, Ms. Hunter suffered significant harm, including financial loss, denial of due process, and deprivation of her liberty and autonomy.

541.    Plaintiffs seek a judgment declaring that the acts, omissions, policies, and practices complained of herein constitute negligent hiring, supervision, or retention and that Defendants are vicariously liable for the acts of its employee under applicable principles of agency, respondeat superior, and state and federal law, and further seek the damages and equitable relief as set forth in the Prayer for Relief.

## COUNT XVII – INVASION OF PRIVACY
### *N.Y. Civ. Rights Law §§ 50 and 51*
### (Against Amanda Clears)

542.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

543.    Amanda Clears, while acting within the scope of her duties as a care specialist at Coterie, willfully and without Ms. Hunter's consent, disclosed confidential information to members of the media, including Ms. Hunter's location, condition, and specific room number at the facility.

544.    Amanda Clears further participated in and facilitated the unauthorized photographing of Ms. Hunter within the private confines of her assisted living unit, including during times when Ms. Hunter was in a state of undress. These photographs were reportedly sold to commercial media outlets for personal profit.

545.    These acts constitute a violation of Ms. Hunter's statutory right to privacy under N.Y. Civ. Rights Law § 50 (criminal provision) and § 51 (civil cause of action), which prohibit the

use of a living person's name, likeness, or image for advertising or trade purposes without prior written consent.

546.    As a direct and proximate result of Defendant's actions, Ms. Hunter suffered severe emotional distress, reputational harm, and loss of dignity.

547.    Plaintiffs seek injunctive relief, statutory and punitive damages, attorneys' fees, and all other appropriate relief under the law.

### COUNT XVIII – VIOLATION OF NEW YORK JUDICIARY LAW § 487
**(Against Sabrina Morrissey, Morrissey & Morrissey LLP, David Pikus, Bressler, Amery & Ross, P.C., Carolyn Wolf, Abrams Fensterman LLP, Phillip Solomon, Solomon's Law Office, P.C. Linda Redlisky, Rafferty & Redlisky LLP, Sadatu Salami, and Law Offices of Salami-Oyakhilome)**

548.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

549.    New York Judiciary Law § 487 provides a cause of action against any attorney who engages in deceit or collusion with intent to deceive the court or any party; willfully delays a client's matter for personal gain; or willfully receives any compensation not earned.

550.    Each of the Defendants, acting in their capacity as licensed attorneys in the State of New York, engaged in deceit, collusion, or intentional misconduct in connection with the guardianship proceedings instituted against Ms. Hunter.

*Against Sabrina Morrissey and Morrissey & Morrissey LLP*

551.    Sabrina Morrissey, an attorney acting as guardian for Ms. Hunter, used her legal knowledge and fiduciary position to intentionally withhold funds from Ms. Hunter to prevent legal challenges to the guardianship, thereby interfering with Ms. Hunter's constitutional and contractual rights.

552.    Sabrina Morrissey falsely represented to the court that Ms. Hunter's medical, financial, and legal needs were being met, while at the same time isolating Ms. Hunter, denying her retained counsel access, failing to make contractually or court-ordered payments, and engaging in unauthorized commercial exploitation of her likeness and property.

553.    Sabrina Morrissey also knowingly failed to file required court accountings, or filed fraudulent accountings, while authorizing payments to parties engaged in the guardianship scheme—misleading both the court and Ms. Hunter.

554.    Sabrina Morrissey knowingly engaged in efforts to exclude Ms. Hunter's retained counsel from court proceedings without lawful authority or a capacity determination.

*Against David Pikus and Bressler, Amery & Ross, P.C.*

555.    David Pikus filed or supported guardianship petitions based on materially misleading or fabricated evidence, including the Kaminski Letter.

556.    David Pikus, as a stranger to the proceedings, participated in communications and filings that led to the ex parte sealing of Ms. Hunter's emergency petition—without notice or opportunity for Ms. Hunter's counsel to object—resulting in intentional concealment from the court, the public, and the opposing party.

557.    David Pikus knowingly engaged in efforts to exclude Ms. Hunter's retained counsel from court proceedings without lawful authority or a capacity determination.

*Against Carolyn Wolf and Abrams Fensterman, LLP*

558.    Carolyn Wolf represented Bernie Young in a guardianship petition funded with Ms. Hunter's own American Express account—without her consent.

559.    Carolyn Wolf accepted and utilized unauthorized funds from Ms. Hunter's account to advance legal actions against her.

560.    Carolyn Wolf acted to assist the guardianship petition while concealing her firm's financial conflict, thereby deceiving both the court and the injured party.

561.    Carolyn Wolf knowingly engaged in efforts to exclude Ms. Hunter's retained counsel from court proceedings without lawful authority or a capacity determination.

*Against Phillip Solomon and Solomon's Law Office, P.C.*

562.    Phillip Solomon was appointed as court evaluator, but failed to conduct a meaningful investigation, disregarded exculpatory medical and financial evidence, and made a recommendation for guardianship without proper basis.

563.    Phillip Solomon aided in the deprivation of Ms. Hunter's liberty and property rights by submitting a report to the court that functioned as a knowing and material representation.

564.    Phillip Solomon knowingly engaged in efforts to exclude Ms. Hunter's retained counsel from court proceedings without lawful authority or a capacity determination.

*Against Linda Redlisky and Rafferty & Redlisky LLP*

565.    Linda Redlisky was appointed as counsel to Ms. Hunter but failed to provide zealous or independent representation.

566.    Linda Redlisky colluded with other parties by failing to challenge the deficient medical documentation and failing to advocate for less restrictive alternatives.

567.    Linda Redlisky's inaction and alignment with adversarial parties functioned as a deceitful deprivation of Ms. Hunter's right to due process and competent representation.

568.    Linda Redlisky knowingly engaged in efforts to exclude Ms. Hunter's retained counsel from court proceedings without lawful authority or a capacity determination.

*Against Sadatu Salami and Law Offices of Salami-Oyakhilome*

569.    Sadatu Salami was brought in as an impartial party to assist with the representation of Ms. Hunter but continued the pattern of deficient and complicit representation.

570.    Sadatu Salami failed to investigate or challenge the basis for the continued guardianship despite mounting evidence of Ms. Hunter's competence and wishes.

571.    Sadatu Salami aided in the deception of both the court and her purported client by effectively supporting the enterprise through silence and willful inaction.

572.    Sadatu Salami knowingly engaged in efforts to exclude Ms. Hunter's retained counsel from court proceedings without lawful authority or a capacity determination.

573.    Each of these Defendants acted with intent to deceive the court, the public, and/or Ms. Hunter, or consented to deceit perpetrated by others, and thereby violated New York Judiciary Law § 487.

574.    As a result of this misconduct, Ms. Hunter has suffered substantial injury, including involuntary confinement, financial loss, emotional distress, reputational harm, and denial of constitutional rights.

575.    Plaintiffs seek a judgment declaring that Defendants have violated Judiciary Law § 487, treble damages pursuant to the statute, attorney's fees and costs, and the relief and/or damages as set forth in the prayer for relief.

## COUNT XIX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Against Sabrina Morrissey, Lori Schiller, David Pikus, Bernie Young, Phillip Solomon, Linda Redlisky, and Amanda Clears)**

576.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

*Against Lori Schiller, Sabrina Morrissey, David Pikus, Bernie Young, Phillip Solomon, and Linda Redlisky*

577.    Defendants engaged in extreme and outrageous conduct by manufacturing the appearance of conflict between Ms. Hunter and Mr. Hunter, when in truth, the conflict stemmed from Defendants' own concealment, mismanagement, and refusal to honor Ms. Hunter's court-approved obligations.

578.    These false representations, which were deliberately made and perpetuated, were intended to discredit Mr. Hunter, alienate him from Ms. Hunter, and justify the imposition of state control over Ms. Hunter's person and property.

579.    This conduct was undertaken with full knowledge of Mr. Hunter's historical and continuing efforts to support Ms. Hunter emotionally and professionally following their divorce.

580.    By characterizing Mr. Hunter as a threat or opportunist, Defendants caused widespread reputational harm and subjected Mr. Hunter to public humiliation and distress.

581.    Defendants' actions were malicious, calculated, and devoid of lawful justification, and they caused Mr. Hunter to suffer severe emotional and psychological injury.

*Against Amanda Clears*

582.    Amanda Clears engaged in extreme and outrageous conduct by deliberately exploiting Ms. Hunter's vulnerable condition, disclosing private health and residency information, and distributing unauthorized photographs of Ms. Hunter during moments of vulnerability.

583.    Such conduct was intentional, malicious, and done with reckless disregard for the predictable psychological trauma that would result.

584.    As a direct consequence of Amanda Clear's acts, Ms. Hunter suffered severe emotional distress, anxiety, humiliation, and trauma, thereby entitling her to compensatory and punitive damages under New York common law.

585.    Plaintiffs seek a judgment declaring that the acts, omissions, policies, and practices complained of herein constitute intentional infliction of emotional distress and further seek the relief and/or damages as set forth in the prayer for relief.

## COUNT XX – DEFAMATION
**(Against Sabrina Morrissey, Lori Schiller, David Pikus, Bernie Young, Phillip Solomon, and Linda Redlisky)**

586.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

587.    Defendants made and published false and defamatory statements of fact concerning Ms. Hunter, both in official legal filings and through verbal communications to third parties. These statements were designed to portray Mr. Hunter as a financial predator and destabilizing influence, despite no credible evidence supporting such accusations. These falsehoods were designed to malign Mr. Hunter's character, exclude him from any role in advocating for Ms. Hunter's legal rights, and justify isolating her under a court-imposed guardianship.

588.    In or around February 2022, Lori Schiller submitted communications to Wells Fargo's legal and risk management departments in which she allegedly claimed that Mr. Hunter was "attempting to access Wendy's accounts" and posed a "financial threat."

589.    Bernie Young, acting as a manager or representative during the relevant period, falsely told production partners, court evaluators, and others in the entertainment industry that Mr. Hunter was "trying to worm his way back in to control Wendy," and that Mr. Hunter was

"dangerous" and "toxic," despite Mr. Hunter's total lack of control or authority over Ms. Hunter's career or finances post-divorce.

590.    David Pikus made verbal statements that Mr. Hunter had a "history of financial control" over Ms. Hunter and was "attempting to reassert influence" despite a finalized divorce.

591.    Phillip Solomon, in communications with entertainment attorneys and studio representatives, falsely claimed that Mr. Hunter "never stopped trying to control Wendy's money," and these statements have been cited in reports on the disruption of Mr. Hunter's business relationships post-guardianship.

592.    Linda Redlisky, in her role as court-appointed counsel for Ms. Hunter, falsely stated to court personnel and financial institutions that Mr. Hunter had "pressured Wendy regarding estate decisions," despite the absence of any such interaction post-divorce in 2020.

593.    Each of these statements were knowingly false when made, made with knowledge of their falsity or with reckless disregard for the truth, and disseminated with the intent to harm Mr. Hunter's reputation, credibility, and standing.

594.    The statements sought to create a false narrative in which Mr. Hunter was depicted as a manipulative or dangerous figure —even though there was no legal or factual basis to justify such characterizations.

595.    The ultimate purpose of these defamatory statements was to create a narrative of hostility, thereby isolating Ms. Hunter from one of her most long-standing supporters who posed a credible challenge to the necessity and lawfulness of the guardianship.

596.    Defendants' defamatory statements were made without privilege and with actual malice or reckless disregard for the truth. Even where statements were made in court filings, the malice and falsity underlying them disqualify them from any absolute or qualified immunity.

Statements made outside judicial proceedings, including to media, financial institutions, and third parties, are wholly unprotected.

597.    As a direct and proximate result of Defendants' defamatory statements, Mr. Hunter suffered public ridicule, severe injury to his professional and personal reputation, and profound emotional distress.

598.    Plaintiffs seek a judgment declaring that the acts, omissions, policies, and practices complained of herein constitute defamation, and further seek the relief and/or damages as set forth in the prayer for relief.

## COUNT XXI – DECLARATORY AND INJUNCTIVE RELIEF
### *Pursuant to 28 U.S.C. §§ 2201–2202 and Fed. R. Civ. P. 57*
**(Against All Applicable Defendants, including NYAG)**

599.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

600.    This is a civil action seeking declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 and Fed. R. Civ. P. 57.

601.    The imposition and maintenance of the guardianship violated Ms. Hunter's constitutional rights under the Due Process Clause of the Fourteenth Amendment and her right to counsel of choice under the First and Sixth Amendments, as well as her right to freedom from unreasonable seizure under the Fourth Amendment.

602.    The guardianship resulted in the unlawful suspension of Ms. Hunter's valid Power of Attorney, the deprivation of her right to maintain a legal relationship with counsel of her own choosing, the impairment of contractual rights under a valid MSA, through the withholding of support payments owed to her ex-husband and co-Plaintiff Kelvin Hunter, and the issuance of court orders based on proceedings that failed to meet minimal constitutional and statutory standards.

603.    Various defendants, including Sabrina Morrissey and her firm, acted in concert with others to perpetuate these violations through misrepresentations, concealment, and procedural manipulation—all of which operated under color of state law or with the court's imprimatur.

604.    NYAG is statutorily charged under N.Y. Exec. Law § 63(1) and N.Y. Mental Hyg. Law §§ 81.44–81.48 with overseeing the integrity of fiduciary appointments, the protection of incapacitated or vulnerable persons, and the investigation of abuse or mismanagement of guardianships.

605.    Despite numerous public reports, notice events, and compelling evidence of ongoing abuse, misappropriation, and systemic civil rights violations, the NYAG has failed to act—constituting a breach of statutory and constitutional obligations.

606.    An actual and immediate controversy has arisen and now exists between Plaintiffs and Defendants.

607.    The parties have genuine and opposing interests that are direct and substantial.

608.    Plaintiffs have no adequate remedy at law.

609.    Unless enjoined by this Court, Ms. Hunter will continue to be subjected to Defendants' unlawful practices, acts, and omissions.

610.    Plaintiffs seek a judicial declaration to determine the validity and constitutionality of the guardianship proceedings imposed upon Ms. Hunter, the legality of her exclusion from representation and due process protections, and the statutory obligations of NYAG to intervene in cases of fiduciary abuse and unlawful guardianship.

## PUNITIVE DAMAGES

611.    Defendants' actions on which this Complaint is based were malicious in that they were accompanied by ill will toward Ms. Hunter.

612.    Defendants' actions were also done wantonly, in reckless or callous disregard of, or with deliberate indifference to, the rights of Ms. Hunter.

613.    Defendants acted oppressively and injured Ms. Hunter with unnecessary harshness or severity by misuse and abuse of their authority and power over Ms. Hunter.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court to enter judgment in their favor and against all Defendants, jointly and severally, and award Plaintiffs all relief available under law and equity, including, but not limited to:

(a) Declaratory Relief: A declaration that the initiation and maintenance of the guardianship violated Ms. Hunter's constitutional rights; that the imposition of the guardianship was procedurally and substantively deficient; that the suspension of her Power of Attorney and exclusion of her chosen legal counsel were unlawful; that all orders issued under these conditions are void; that the unlawful interference with the Marital Settlement Agreement, defamatory statements, and civil conspiracy violated Ms. Hunter's contractual and constitutional rights; that NYAG has a legal and statutory duty to investigate alleged fiduciary and guardianship abuse; that NYAG's failure to act violates its statutory duties and frustrates the protections intended under N.Y. Exec. Law § 63(1) and N.Y. Mental Hyg. Law §§ 81.44–81.48; that Plaintiffs are entitled to federal oversight or court-monitored relief due to NYAG's inaction.

(b) Injunctive Relief: A permanent injunction:

    i.    Enjoining the unlawful suspension of Ms. Hunter's Power of Attorney;

ii.   Ordering Ms. Hunter's immediate release from involuntary confinement;

iii.  Prohibiting any further interference by Defendants with Ms. Hunter's right to counsel, property, speech, and family access;

iv.   Enjoining Defendants from any further interference with the Marital Settlement Agreement between Ms. Hunter and Mr. Hunter;

v.    Terminating Sabrina Morrissey access to Ms. Hunter's financial accounts to prevent Defendants from using Ms. Hunter's assets to defend Sabrina Morrisey's interests in this matter;

vi.   Ordering that Sabrina Morrissey's appointment as Guardian be terminated effectively immediately and that a new impartial and unbiased Guardian be appointed to oversee Ms. Hunter's affairs;

vii.  Directing the unsealing and full production of the complete guardianship file of Wendy J. Williams Hunter, including but not limited to all court filings, medical evaluations, financial reports, hearing transcripts, and communications by or between court-appointed fiduciaries, attorneys, and financial institutions, pursuant to Plaintiffs' due process rights under the Fourteenth Amendment and the public interest in preventing fraud, abuse, and concealment in quasi-judicial proceedings involving fundamental liberty and property rights; and

viii. Requiring a full forensic accounting and return of all misappropriated property, inclusive of all assets, when and where located, spent, depleted and/or earned since the time that Lori Schiller became Ms. Hunter's financial advisor in or around 2015, including the calculator and payment of arrears owed to Mr. Hunter under the Marital Settlement Agreement.

(c) Grant Recusal Request: Recuse Judge Lisa Sokoloff as the presiding court official over the guardianship proceeding.

(d) Grant Next Friend Motion: Issue an order allowing Plaintiff Kelvin Hunter's Next Friend Motion to proceed (a separate ex parte motion for which has been filed herewith).

(e) Compensatory Damages: For financial loss, reputational damage, emotional distress, reputational harm, legal expense, and deprivation of liberty, in an amount to be determined at trial, but in no event less than Two Hundred Fifty Million Dollars ($250,000,000.00). Specifically, for Ms. Hunter, this includes, but is not limited to, losses of approximately $20 million per year in earnings, her $80 million dollar estate, her $4 million dollar condominium, personal goods in excess of $10 million, and severe reputational harm. For Mr. Hunter, this includes, but is not limited to, damages for the wrongful cessation of severance payments owed under the Marital Settlement Agreement, including lost income and associated penalties or fees incurred, and damages for intentional infliction of emotional distress and reputational injury.

(f) Restitution and Disgorgement: Full return of assets and property wrongfully taken or managed, and disgorgement of all unlawful profits.

(g) Punitive Damages: Against all Defendants in their personal capacities to punish conduct that was willful, malicious, fraudulent, and in reckless disregard of Plaintiffs' rights.

(h) Statutory Damages: As provided under 42 U.S.C. § 1983, the ADA, TILA, FCRA, GLBA, and other applicable laws.

(i) Treble Damages: As provided under RICO.

(j) Attorneys' Fees and Costs: Under 42 U.S.C. § 1988 and other applicable statutes.

(k) Pre- and Post-Judgment Interest: As allowed by law.

(l)  Further Relief: Such other relief as this Court deems just, proper, and equitable.


DATED: June 17, 2025

Respectfully submitted,

LaShawn N. Thomas
MIAMI ENTERTAINMENT LAW GROUP
261 North University Drive, Suite 500
Plantation, Florida 33324
Tel: (305) 417-6450
Email: lthomas@miamientertainmentlawgroup.com

Celeste N. McCaw
MIAMI ENTERTAINMENT LAW GROUP
261 North University Drive, Suite 500
Plantation, Florida 33324
Tel: (305) 417-6450
Email: cmccaw@miamientertainmentlawgroup.com


I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief. Executed on this 17th day of June, 2025.

LaShawn N. Thomas


I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief. Executed on this 17th day of June, 2025.

Celeste N. McCaw